STATE v. WASHINGTON

[141 N.C. App. 354 (2000)]

STATE OF NORTH CAROLINA v. FREDERICK L. WASHINGTON

No. COA99-1249

(Filed 29 December 2000)

## 1. Evidence— trajectory of bullet—cross-examination of lieutenant investigating scene of crime—not expert testimony—not opinion testimony

The trial court did not abuse its discretion in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault by refusing to allow defense counsel to cross-examine a lieutenant about the trajectory of a bullet fired from defendant's pistol because: (1) the lieutenant's answers were not admissible under N.C.G.S. § 8C-1, Rule 702 based on the fact that defendant did not attempt to qualify the lieutenant as an expert even though the trial court advised defendant that the opinion may be considered if defendant provided a better foundation for the witness's qualifications for giving such an opinion; (2) the lieutenant's answers were not admissible under N.C.G.S. § 8C-1, Rule 701 based on the fact that defendant did not show that the proffered opinion testimony was rationally based on the perception of the witness or that it would be helpful to a determination of the distance between defendant and the victims at the time of the shooting; and (3) the lieutenant did not observe the shooting but instead participated in the subsequent investigation, meaning the jury had precisely the same information as the witness.

## 2. Witnesses— sequestration—no violation by witnesses traveling to and from court together

The trial court did not abuse its discretion in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault by allowing two of the victims to travel to and from court together while under a court order sequestering the State's witnesses, because: (1) it appears from the transcript that the order only precludes the two victims from being present while the other testifies; (2) defendant's written motion to sequester made no specific request to prevent such contact, nor did the trial court prevent such travel; (3) the trial court instructed the victim who had already testified not to discuss the case with the other victim who had yet to testify, and the testifying victim agreed; (4) defendant did not object to the trial

court's verbal instructions; and (5) defendant offered no proof that the witnesses violated the trial court's order or verbal instructions not to discuss the case.

**3. Evidence— prior assaults on victim—admissible to show malice, premeditation, deliberation, intent or ill-will—lack of mistake**

The trial court did not abuse its discretion in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault by allowing the State to introduce evidence through a witness that defendant had choked the murdered victim on an earlier occasion, because: (1) a defendant's prior assaults on the victim, for whose murder defendant is presently being tried, are admissible for the purpose of showing malice, premeditation, deliberation, intent or ill-will; (2) the evidence was relevant to an issue other than defendant's character based on the fact that defendant contended he shot this victim by mistake; and (3) the evidence was not unfairly prejudicial under N.C.G.S. § 8C-1, Rule 403 when the trial court's procedure of conducting a voir dire examination of the witness to determine the substance of her testimony demonstrated the trial court conducted the balancing test under Rule 403.

**4. Evidence— photograph of defendant taken shortly after arrest—relevant to theory of self-defense—corroboration—no improper prejudice**

The trial court did not abuse its discretion in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault by admitting a photograph of defendant taken shortly after his arrest even though defendant argues the photograph depicts him as being mean, because: (1) the photograph was relevant to defendant's theory of self-defense to demonstrate that defendant was neither injured or disheveled; (2) while defendant is unsmiling, he does not appear either threatening or evil; (3) the photograph was admissible to corroborate the testimony of a sergeant and a detective; and (4) defendant has failed to demonstrate any improper prejudice resulting from admission of the photograph.

**5. Constitutional Law— double jeopardy—charged with attempted murder and felonious assault—no violation**

Defendant's double jeopardy rights were not violated when the trial court submitted the charges of attempted murder and

felonious assault to the jury, because proof of a fact was necessary for each conviction that was not necessary for the other.

**6. Constitutional Law— double jeopardy—attempted murder—felonious assault—more than one charge for same incident**

Defendant's double jeopardy rights were not violated when the trial court charged both felonious assault and attempted murder as to each victim even though defendant contends these charges arose out of the same incident, because: (1) defendant has been charged with two separate and distinct offenses which happen to grow out of the particular facts of this case; and (2) a defendant may be charged with more than one offense based on a given course of conduct.

**7. Homicide; Assault— attempted murder—felonious assault—motion to dismiss**

The trial court did not err by denying defendant' motion to dismiss the felonious assault and attempted murder charges even though defendant contends both charges were predicated on the same evidence, because: (1) a defendant may be charged with more than one offense based on the same course of conduct; and (2) the record reveals that there was substantial evidence against defendant of every essential element of felonious assault and attempted murder.

**8. Criminal Law— prosecutor's argument—defendant's failure to claim self-defense or accident prior to trial**

The trial court did not err by failing to intervene ex mero motu during the State's closing argument using defendant's pretrial silence to show that defendant failed to claim self-defense or accident prior to trial, because: (1) defendant made numerous spontaneous statements to investigators acknowledging that he was in trouble prior to trial, and it would have been natural for defendant to have added that he shot two of the victims in self-defense and a third victim by accident; (2) defendant's pretrial silence was evidence of an inconsistent statement since defendant had the opportunity during his trial testimony to justify his failure to claim self-defense earlier; and (3) even though it was unclear at what point defendant was given his Miranda warnings, it was defendant's burden to establish when he was given Miranda warnings and he could have done so during his testimony or through cross-examination of various witnesses.

**9. Constitutional Law— effective assistance of counsel—failure to object to portions of State's closing argument**

A defendant was not deprived of his right to effective assistance of counsel in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault based on defense counsel's failure to object to portions of the State's closing argument referencing defendant's failure to claim self-defense to investigators at the time of the offense, because: (1) there is no reasonable probability that defense counsel's failure to object affected the outcome of the trial; (2) the evidence of defendant's guilt was more than substantial; and (3) the State's evidence refuted defendant's testimony that he fired at two of the victims only after they charged at him.

**10. Criminal Law— bailiff entered jury room during deliberations—court's failure to declare mistrial sua sponte not error**

The trial court did not abuse its discretion in a prosecution for first-degree murder, two counts of attempted first-degree murder, and felonious assault by failing to declare a mistrial under N.C.G.S. § 15A-1061 sua sponte after a bailiff entered the jury room during deliberations, because: (1) when the intrusion by the bailiff became known by the trial court, the judge put the bailiff under oath and determined the bailiff had knocked on the door of the jury room without the authorization of the court to retrieve some magazines for defendant at the request of another bailiff, that the bailiff said nothing to the jurors and the jurors said nothing to him, and that the bailiff heard no deliberations and had no other contact with the jurors; and (2) neither the State nor defendant accepted the court's invitation to make further inquiry of the bailiff, and defendant did not then seek a mistrial.

Appeal by defendant from judgments entered 14 December 1998 by Judge Carl L. Tilghman in Carteret County Superior Court. Heard in the Court of Appeals 19 September 2000.

*Michael F. Easley, Attorney General, by A. Danielle Marquis, Special Deputy Attorney General, for the State.*

*McCotter, McAfee & Ashton, PLLC, by Rudolph A. Ashton, III, and Kirby H. Smith, III, for defendant-appellant.*

STATE v. WASHINGTON

[141 N.C. App. 354 (2000)]

EDMUNDS, Judge.

Defendant appeals from his convictions for first-degree murder, two counts of attempted first-degree murder, and felonious assault. We find no error.

The State's evidence tended to show that Eugene Holiday (Holiday), a United States Marine Corps Sergeant, met Zesthima Reels (Reels) in November or December 1996. He visited Reels at her residence on eight to nine occasions prior to her death. Although Holiday testified that initially there were some romantic feelings between the two, the relationship turned platonic after he learned of Reels' age.

Holiday began receiving telephone calls at his home and office from an unidentified caller in July 1997, and on 16 July 1997, Holiday received a message that a man by the name of "Mr. Washington" called him at work. Holiday did not know anyone by this name. Reels telephoned Holiday on the same day and asked if he had been receiving calls from anyone. When Holiday responded that he had received a telephone call from a "Mr. Washington," Reels said that the man calling was "Pedro" (hereinafter defendant) and that "Pedro" had stolen her purse and taken Holiday's telephone number.

After this conversation, Holiday went to football practice, and upon returning to his barracks, he discovered that he had another message on his answering machine from an unidentified caller. Holiday called Reels and asked to speak with defendant. After some hesitation, Reels eventually put defendant on the telephone, and Holiday told him, "We need to go ahead and get together and talk. I don't understand why you are calling me . . . ." Defendant responded, "Sure, come on down." Holiday testified that defendant did not seem angry or upset; however, he thought that defendant suspected him of being involved with Reels and agreed to meet defendant because he wanted defendant to hear in person that his interest in Reels was not romantic.

Holiday approached Gregory Williams (Williams), another Marine Sergeant, and told him that "he was getting a phone call from [defendant] at work and [defendant was] leaving messages on his answering machine saying that he needed to stay away from his girlfriend." Williams agreed to accompany Holiday to see defendant. Neither Holiday nor Williams carried a weapon.

Upon entering Reels' residence, Holiday and defendant shook hands. Although defendant did not at first appear to be upset, an argument quickly ensued between the two men. Holiday testified that when Reels tried to leave the room during the argument, defendant grabbed her shirt and began choking her. Williams provided similar testimony, although he did not state that defendant choked Reels. Reels then attempted to call the police, and defendant pointed a gun at her head. Williams tried to push Holiday out of the residence, but Holiday feared that he would be shot if he turned his back to defendant. The argument between defendant and Holiday escalated. Defendant shot Holiday in the arm, and Holiday ran out of the residence. Williams testified that he then said, "What the f---?", at which point defendant shot him in the chest, shot Reels, then shot Williams again, hitting him in his arm and nose. Williams fell to the floor. He heard defendant call the police and state that he had just shot two people.

Holiday corroborated Williams by testifying that after he ran out of Reels' residence, he heard Williams say, "What the f---?" followed by three shots. He ran to a neighbor's residence and asked them to call the police. When he saw defendant open the door to Reels' residence, he ran to a local movie theater where he called the police himself.

Morehead City Police Officer Kelly Guthrie (Officer Guthrie) was the first to arrive at the scene. Holiday told her that he had been shot and that a friend who had also been shot was still in the residence. Officer Guthrie handcuffed defendant, who was cooperative. She secured the crime scene and observed that Reels had been fatally wounded. Officer Guthrie interviewed both Holiday and Williams at the hospital within hours of the shootings. Police Sergeant Donald Miller (Sergeant Miller) arrived at the scene shortly after Officer Guthrie. While transporting defendant to the Morehead City Police Department, defendant spontaneously told Sergeant Miller, "I have never been [in] this [much] trouble before but I guess I'm really in a lot of trouble now." Defendant repeated this statement three more times after he arrived at the police department. In addition, defendant inquired as to the extent of injuries suffered by the parties while in route to the police department and again inquired as to the extent of injuries two or three times at the police department. Sergeant Miller photographed defendant at the police department and testified that defendant did not have any physical injuries and that his clothing was not damaged. Detective Mike Arter (Detective Arter) also tes-

tified that defendant made the following spontaneous statements: (1) "I know I broke the law. You are not going to get any more trouble out of me;" and (2) "I have never been in trouble in my life, but I am certainly in a lot of trouble now." Both statements were made after defendant was taken to an interview room at the police department, and the second statement was repeated by defendant several times. In addition, Detective Arter testified as to the photograph Sergeant Miller took of defendant at the police department and confirmed that defendant did not have injuries and that his clothes were not torn.

Police Lieutenant Steve Sanders (Lieutenant Sanders) investigated the crime scene, where he found defendant's weapon in the front yard and four shell casings in Reels' residence. He interviewed Holiday on 17 July 1997 and Williams on 21 July 1997. Lieutenant Sanders testified that Williams' statement was substantially similar to his testimony in court. On cross-examination, the court sustained the State's objection to a hypothetical question posed by defendant regarding the trajectory of a bullet.

Dr. Paul Martinez, a medical examiner for Carteret County and an emergency room physician for Carteret General Hospital, was tendered as an expert in emergency room practice. He treated Williams shortly after the shooting and testified that he did not observe any gunshot residue on Williams' or Reels' entrance wounds. A blood alcohol test of both Williams and Reels revealed no presence of alcohol or drugs. Ronald Marrs, a special agent with the State Bureau of Investigation, was tendered as an expert in the field of firearms examination. He examined the weapon, four shell casings, and two bullets retrieved from the crime scene. He concluded that it took more than eleven and a half pounds for the pistol to fire and that the trigger had to be pulled separately for each firing. He further testified that the pistol would not leave gunshot residue at distances of four feet or greater and that no such residue was found on Williams' or Holiday's shirts. Jacqueline Washington, defendant's first cousin and a long-time friend of Reels, testified over objection that in January 1997 she witnessed defendant choking Reels. Paula Clearwater, a daycare center employee who worked with Reels, testified as to the victim's good character. Finally, the 911 audio tape was played for the jury.

Eight witnesses testified for defendant. Rosa Langdon, a friend and former guidance counselor of defendant, and Reverend Shadrach Hugh Barrow, III testified as to defendant's good character, reputa-

STATE v. WASHINGTON

[141 N.C. App. 354 (2000)]

tion and veracity. Joseph Washington, Jr., defendant's first cousin and an officer with the Beaufort Police Department, and Martin Jones, a friend of defendant and a shift supervisor at the Carteret County Jail, testified as to defendant's appearance after the shootings. Martin Jones stated that defendant was quiet and that he cried when talking with his mother. Joseph Washington stated that defendant seemed "upset, sort of in a fog," remorseful and sincere. John Cole, an emergency medical technician with the Department of Emergency Medical Services for Morehead City, and Officer Guthrie, who was recalled by defendant, testified as to inconsistencies and contradictions in Williams' and Holiday's testimony. Specifically, John Cole stated that at the scene of the crime Williams told him that he fell to the floor after the first bullet hit him. Officer Guthrie similarly testified that when she interviewed Williams at the hospital, he told her that he fell after the first bullet hit his chest; in addition, he did not mention defendant choking the victim or pointing a gun to the victim's head. Officer Guthrie also stated that when she spoke with Holiday, he did not tell her anything about defendant choking the victim.

Finally, defendant testified in his own.behalf. He stated that he began dating Reels in November 1996. On 4 July 1997, he accidently found Reels' scheduling book and saw Holiday's telephone number. He called Holiday the next morning but did not speak with him. He did not have any further contact with Holiday until 16 July 1997, when he overheard Reels having a telephone conversation with Holiday. At this time, Reels told defendant that Holiday wanted to speak with him and was going to call back in five minutes. When Holiday called, defendant told him, "I just wanted to know why you keep calling over here having someone to drop you off. You are giving [Reels] flowers when she kick you to the curb for me." Holiday responded, "I will be over there in 15 minutes."

Defendant testified that Holiday became aggressive as soon as he arrived at Reels' home, repeatedly telling defendant that he wanted to take him outside and beat him up. Defendant stated that he unholstered his gun because he feared Holiday and Williams, who were young and physically fit, while he had a bad back. Williams tried to persuade Holiday to leave, and Reels also tried to push Holiday and Williams out of her home. When Holiday and Williams charged him, he began firing. Holiday fell first, followed by Williams. Defendant looked over the counter and could not see Holiday. He felt something grab his arm, and accidentally shot Reels. Defendant then called the police.

Defendant was arrested on 16 July 1997 and indicted on 4 August 1997 for the first-degree murder of Reels and for felonious assaults on Williams and Holiday. On 2 February 1998, defendant was also indicted for attempted murder of Williams and Holiday. His trial began on 3 December 1998, and he was found guilty of all charges on 11 December 1998. Thereafter, judgments and commitments were entered, and judgment was arrested for the felonious assault charge of Holiday. Defendant appeals.

I.

[1] Defendant first assigns as error the trial court's refusal to allow defense counsel to cross-examine Lieutenant Sanders about the trajectory of a bullet fired from defendant's pistol. Rule 702 of the North Carolina Rules of Evidence controls the admissibility of expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C. Gen. Stat. § 8C-1, Rule 702(a) (1999). Testimony of a lay witness, on the other hand, "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (1999). A "trial court has wide discretion in determining whether expert testimony is admissible," and " 'may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Owen*, 133 N.C. App. 543, 549, 516 S.E.2d 159, 164 (citations omitted), *disc. review denied*, 351 N.C. 117, 540 S.E.2d 744 (1999). Similarly, whether a lay witness may testify as to an opinion is reviewed for abuse of discretion. *See State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988).

Lieutenant Sanders was neither tendered nor recognized as an expert during defendant's trial. Rather, he testified that he had been employed with the Morehead City Police Department for eighteen years, was currently serving as supervisor of the traffic division, and had assisted in the investigation of the present case. Our courts have previously found that it is not error to exclude a witnesses' testimony where the witness was not tendered as an expert. Specifically, in

*State v. Shuford*, 337 N.C. 641, 447 S.E.2d 742 (1994), our Supreme Court held that the trial court did not err in denying a murder defendant's request to have an ambulance driver give opinion testimony as to the distance from which the victim was shot unless he was qualified as an expert. Although the court indicated that it would allow the defendant to attempt to qualify the driver as an expert, the defendant declined. Accordingly, the court held:

> Defendant made no showing that the proffered opinion testimony was rationally based on the perception of the witness or that it would be helpful to a determination of the issue of the distance from which the victim was shot. In fact, as noted above, defense counsel candidly admitted to the court that he knew nothing about the witness' qualifications, except the witness' place of employment and that he signed the ambulance call report.
>
> At oral argument, defendant acknowledged that a layperson could provide this type of opinion testimony "if he was familiar with guns and gunshot wounds." Yet, no such information regarding the qualifications of the witness to provide this opinion testimony was presented to the trial court. Further, defendant declined an invitation by the trial court to locate the witness and obtain some information that would support his qualification to testify on this subject. . . . [D]efendant certainly had the opportunity to provide support for the witness testifying as a lay witness or as an expert. . . . Defendant has failed to demonstrate that the trial court abused its discretion by refusing to admit this testimony without some showing that the witness was qualified to testify, either as a lay witness or as an expert.

*Id.* at 649-50, 447 S.E.2d at 747.

Similarly, in the case at bar, defendant did not attempt to qualify Lieutenant Sanders as an expert, even though the court advised defendant in ruling on the State's objection that "[a]t this point I'm going to still sustain the objection. If you can lay a better foundation to this witness's qualifications for giving such an opinion I may reconsider it." Defendant made no further effort to qualify the witness. Accordingly, the testimony was not admissible under Rule 702.

As to defendant's argument that the investigator's answers were admissible under Rule 701, defendant did not show that the proffered opinion testimony was rationally based on the perception of the witness or that it would be helpful to a determination of the distance

between defendant and the victims at the time of the shooting. Lieutenant Sanders did not observe the shooting; instead he participated in the subsequent investigation. Defendant's questions sought an opinion about the path of a bullet premised upon: (1) a diagram that was not to scale; and (2) a resolution of conflicting testimony in defendant's favor. The jury had precisely the same information as did the witness. Any lay opinion by an investigator based upon such a problematic foundation would not have been helpful to a determination of a fact in issue. Accordingly, the trial court did not err in sustaining the State's objection.

II.

[2] Defendant next argues that the trial court erred in allowing Williams and Holiday to travel to and from court together while under a court order sequestering the State's witnesses. On 3 September 1998, defendant filed a motion "to sequester the witnesses for the State and allow them to come into the courtroom to testify as they are called to the witness stand." Although the order granting defendant's motion is not included in the record on appeal, both parties agree and the transcript reflects that the motion was granted. It appears from the transcript that the order only precludes Williams and Holiday from being present while the other testifies.

However, after Williams had testified but before Holiday was called as a witness, defendant became concerned that the two witnesses would have contact with each other before Holiday would testify. Defendant noted:

> Judge, the defense has a concern an order has been entered sequestering Gregory Williams and Jonathan Holiday. Greg Williams has testified. Have a weekend before us. I would ask that the court order Gregory Williams not to have any contact with Jonathan [Holiday].

After both witnesses stated that they traveled to court together that day, the court denied defendant's request, but instructed Williams:

> THE COURT: Is there any response to the sequestration by the defendant concerning sequestration order Mr. Williams, or excuse me, Sergeant Williams, I apologize, your testimony in that of Sergeant Holiday is subject to a sequestration order by the court which means that during the trial of this case neither of you are to discuss what your testimony would be with the other. Do you understand what that means?

A: Yes, sir.

THE COURT: So that on your way home this afternoon and throughout the weekend you are not to discuss the substance of your testimony here in court with Sergeant Holiday, and he is not to discuss what he will testify to with you. And probably the better practice is for neither of you to talk about this case at all during this weekend. You understand?

A: Yes, sir.

THE COURT: And will you comply with that order of the court?

A: Yes, sir.

The reason behind sequestration is two-fold. *See State v. Harrell,* 67 N.C. App. 57, 64, 312 S.E.2d 230, 236 (1984). Sequestration "acts as a restraint on witnesses tailoring their testimony to that of earlier witnesses," and "it aids in detecting testimony that is less than candid." *Id.* (citing *Geders v. United States,* 425 U.S. 80, 47 L. Ed. 2d 592 (1976)). However,

[t]he separation of witnesses . . . is not founded on the idea of keeping the witnesses from intercourse with each other. That would be a vain attempt. The expectation is not to prevent the fabrication of false stories, but by separate cross-examination to detect them.

*State v. Jackson,* 309 N.C. 26, 32, 305 S.E.2d 703, 709 (1983) (citation omitted).

Although defendant argues that Williams and Holiday disobeyed the court's order by traveling to and from court together, defendant's written motion to sequester made no specific request to prevent such contact. Nor did the court forbid such travel in granting defendant's motion or in its verbal instructions. Rather, the court instructed Williams, who had already testified, not to discuss the case with Holiday, who had yet to testify, and Williams agreed. The court's order and instructions were not an abuse of discretion. *See State. v. Young,* 312 N.C. 669, 677, 325 S.E.2d 181, 186 (1985) (stating "[a] motion to sequester witnesses is addressed to the sound discretion of the trial judge and is not reviewable on appeal absent a showing of an abuse of discretion"). In addition, defendant did not object to the trial court's verbal instructions. *See State v. Carson,* 46 N.C. App. 99, 102, 264 S.E.2d 404, 406 (1980) (holding that defendant, by failing to object to the trial court's failure to sequester witnesses,

"waived his right to raise the propriety of the trial court's failure to order sequestration").

Moreover, defendant offered no proof that the witnesses violated the trial court's order or verbal instructions not to discuss the case. Instead, defendant alleges only general concerns, stating that the witnesses "in all likelihood were discussing the case" and that "it is foolhardy to believe that they did not discuss the case." We decline to speculate that the witnesses violated the court's order in the absence of any evidence to the contrary. Accordingly, this assignment of error is overruled.

## III.

**[3]** Defendant also argues that the trial court erred by allowing the State to introduce evidence through Jacqueline Washington that defendant had choked the victim on an earlier occasion. In the alternative, defendant argues that even if this evidence were relevant, its probative value was substantially outweighed by the danger of unfair prejudice.

This issue is governed by Rule 404(b) of the North Carolina Rules of Evidence, which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (1999). This rule is

> a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Moreover, this Court has consistently held "that a defendant's prior assaults on the victim, for whose murder defendant is presently being tried, are admissible for the purpose of showing malice, premeditation, deliberation, intent or ill will against the victim." *State v. Alston*, 341 N.C. 198, 229, 461 S.E.2d 687, 703 (1995) (citations omitted); *see also State v. Gary*, 348 N.C. 510, 520, 501 S.E.2d 57, 64 (1998); *State*

*v. Cox*, 344 N.C. 184, 188, 472 S.E.2d 760, 762 (1996) (evidence of previous threats against victim also admissible); *State v. Kyle*, 333 N.C. 687, 697, 430 S.E.2d 412, 417 (1993).

In the case at bar, evidence of defendant's prior assault on the victim tended to establish not only malice, intent, premeditation and deliberation, all elements of first-degree murder, but more importantly, it tended to establish ill-will against the victim and lack of accident. Because defendant contended that he shot Reels by mistake, this evidence was relevant to an issue other than defendant's character.

Next, we must determine if this relevant evidence was unfairly prejudicial to defendant and inadmissible under Rule 403 of the North Carolina Rules of Evidence. Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C. Gen. Stat. § 8C-1, Rule 403 (1999). Our courts have previously held that "[n]ecessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree." *State v. Weathers*, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994). Moreover, "exclusion of evidence under Rule 403 is a matter generally left to the sound discretion of the trial court." *Alston*, 341 N.C. at 229, 461 S.E.2d at 703 (citation omitted). Here, when defendant objected, the trial court excused the jury, conducted a *voir dire* examination of Jacqueline Washington to determine the substance of her testimony, and then considered arguments of counsel before overruling defendant and permitting the jury to hear the testimony. Although the trial court did not make a specific finding that the probative value of the evidence outweighed its prejudicial effect, the procedure that was followed demonstrated that the trial court conducted the balancing test under Rule 403. We cannot say that the trial court abused its discretion in admitting the evidence. Accordingly, this assignment of error is overruled.

IV.

[4] Defendant next contends that the court erred in admitting a photograph of him taken shortly after his arrest. The photograph was introduced during the testimony of Sergeant Miller and Detective

Arter, and the State thereafter moved to publish the photograph to the jury. Defendant objected, arguing that the photograph only illustrated his facial features and showed that he looked like a "mean kind of fellow." The court overruled defendant's objection, noting that the photograph demonstrated that defendant was neither injured or disheveled, which was relevant to his theory of self-defense discussed in his opening statement.

The admissibility of photographs is governed by Rule 403 of the North Carolina Rules of Evidence, and whether a photograph is more probative than prejudicial is a matter within the discretion of the trial court. *See State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). Defendant argues that the photograph depicted him as "mean" and that as a result the jury may have been predisposed to discount his later testimony. However, we have examined the photograph in question and observe that, while defendant is unsmiling, he does not appear either threatening or evil. Moreover, the court allowed the introduction of defendant's photograph into evidence to corroborate the testimony of Sergeant Miller and Detective Arter. Defendant has failed to demonstrate any improper prejudice resulting from admission of the photograph. In light of the forecast of a self-defense argument, we hold that the trial court did not abuse its discretion in admitting the photograph taken of defendant at the police station. This assignment of error is overruled.

V.

[5] Defendant next raises several related assignments of error pertaining to the court's submission of two counts of attempted murder and two counts of felonious assault to the jury, contending that these charges as to both Williams and Holiday arose out of a single incident and are duplicative. Accordingly, defendant contends that his constitutional right to be free from double jeopardy has been violated, tainting the entire trial.

We first address defendant's contention that the offenses of attempted murder and felonious assault are duplicitous. The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects against multiple punishments for the same offense. *See* U.S. Const. amend. V. The North Carolina Constitution provides similar protection. *See* N.C. Const. art. I, § 19. However, "double jeopardy does not occur unless the evidence required to support the two convictions is identical." *State v. Murray*, 310 N.C. 541, 548, 313 S.E.2d 523, 529 (1984), *overruled on other grounds by State*

*v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988). Where " 'proof of an additional fact is required for each conviction which is not required for the other, even though some of the same acts must be proved in the trial of each, the offenses are not the same.' " *State v. Fernandez*, 346 N.C. 1, 19, 484 S.E.2d 350, 361 (1997) (citation omitted).

Our Supreme Court recently analyzed the elements of both attempted murder and felonious assault and held that "[b]ecause assault with a deadly weapon with intent to kill requires proof of an element not required for attempted murder—use of a deadly weapon—it is not a lesser-included offense of attempted murder." *State v. Coble*, 351 N.C. 448, 453, 527 S.E.2d 45, 49 (2000) (citation omitted). Similarly, malice is an element of attempted murder but not of felonious assault with a deadly weapon with intent to kill. *See State v. Hall*, 59 N.C. App. 567, 297 S.E.2d 614 (1982). Because proof of a fact was necessary for each conviction that was not necessary for the other, defendant was charged with two separate and distinct offenses. Accordingly, he was not subjected to double jeopardy.

**[6]** Defendant next argues that charging both felonious assault and attempted murder as to each victim was error because these charges arose out of the same incident. Defendant cites *State v. Dilldine*, 22 N.C. App. 229, 206 S.E.2d 364 (1974), in which the defendant shot the victim three times in the front and twice in the back. The defendant was charged with one count of felonious assault with intent to kill for the three bullets in front and another count of felonious assault with intent to kill for the two bullets in back. This Court held that "[i]t was improper to have two bills of indictment and two offenses growing out of this one episode." *Id.* at 231, 206 S.E.2d at 366.

However, the Supreme Court later distinguished *Dilldine* in *State v. Ward*, 301 N.C. 469, 272 S.E.2d 84 (1980), noting that:

Defendant's reliance on *Dilldine* is misplaced. There, the defendant was charged on two counts of the *same* offense, felonious assault with intent to kill, on the basis of what can only be characterized as one assault, or one continuous transaction. In the case at bar, defendant has been charged with two separate and distinct offenses which happen to grow out of the particular facts of this case. It is elementary that a defendant may be charged with more than one offense based on a given course of conduct.

*Id.* at 475-76, 272 S.E.2d at 88 (citation omitted). Likewise, in the case at bar, defendant was properly charged with two separate and dis-

tinct offenses as to each victim, felonious assault and attempted murder, even though the offenses both arose out of a single course of conduct.

[7] Defendant also makes the related argument that the trial court erred in denying his motion to dismiss the felonious assault and attempted murder charges, because both charges were predicated on the same evidence. However, as discussed above, a defendant may be charged with more than one offense based on the same course of conduct. Moreover,

> [i]n ruling upon defendants' motion to dismiss, the trial court is required to interpret the evidence in the light most favorable to the State, drawing all reasonable inferences in the State's favor. The defendants' motion must be denied if the State has offered substantial evidence against defendant of every essential element of the crime charged. "Substantial evidence" is defined as that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. The test of the sufficiency of evidence to withstand dismissal is the same whether the State's evidence is direct, circumstantial, or a combination of the two.

*State v. Porter*, 303 N.C. 680, 685-86, 281 S.E.2d 377, 381-82 (1981) (internal citations omitted). The record reveals that there was substantial evidence against defendant of every essential element of felonious assault and attempted murder. Therefore, these assignments of error are overruled.

## VI.

[8] Defendant next argues that in the State's closing argument, the State improperly called the jury's attention to his failure to claim self-defense or accident prior to trial. Examples of the prosecutor's argument include the following:

> The defendant had the opportunity to sit in this courtroom all week, hear what all of the State's witnesses said, and then and only then, did he first reveal to you his version of what happened that night.

> But what did the defendant have to say that night? Did he ever say to the police: I didn't have a choice. I shot them in self-defense.

> When was the first time he said it? After he heard all of the State's evidence from that witness stand. So, let's compare statements

with testimony, let's compare Mr. Washington's statement the night of the shooting and Mr. Williams and Holiday's statement the night of the shooting to the testimony in the courtroom. No self-defense that night. No they were rushing him and I know I broke the law. You won't have anymore trouble out of me. If it would have happened the way he says it happened, he would have been breaking the door down to tell somebody that he shot [Reels] accidently; that they were rushing him and it was self-defense.

Defendant did not object to these and other similar arguments made by the State. Accordingly,

> [t]he standard of review when a defendant fails to object at trial is whether the argument complained of was so grossly improper that the trial court erred in failing to intervene *ex mero motu.* " '[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' "

*State v. Trull,* 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998) (citations omitted), *cert. denied,* 528 U.S. 835, 145 L. Ed. 2d 80 (1999); *see also State v. McNeil,* 350 N.C. 657, 684, 518 S.E.2d 486, 503 (1999) (noting that the argument must "stray[] so far from the bounds of propriety as to impede defendant's right to a fair trial" before a trial court will be required to intervene), *cert. denied,* 529 U.S. 1024, 146 L. Ed. 2d 321 (2000); *State v. Davis,* 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998) (stating that "defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair"), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). Moreover, "[a]rguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases." *Davis,* 349 N.C. at 22, 506 S.E.2d at 466-67 (citation omitted). "In determining whether [an argument] was grossly improper, we must examine the context in which it was given and the circumstances to which it refers." *Trull,* 349 N.C. at 451, 509 S.E.2d at 193 (citations omitted).

A defendant's exercise of his right to remain silent is guaranteed by Article I, Section 23 of the North Carolina Constitution and by the Fifth and Fourteenth Amendments to the Constitution of the United States. *See Doyle v. Ohio,* 426 U.S. 610, 49 L. Ed. 2d 91 (1976).

Accordingly, we will analyze defendant's argument under both the Fifth and Fourteenth Amendments. We first address whether defendant's rights were violated by use of his pre-arrest silence for impeachment purposes.

## A. Pre-Arrest Silence

In *Doyle*, the United States Supreme Court held that it is a violation of a defendant's right under the Due Process Clause to use his silence for impeachment purposes after he has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). Subsequent decisions by the Court, however, have placed limitations on *Doyle*. For instance, in *Jenkins v. Anderson*, 447 U.S. 231, 65 L. Ed. 2d 86 (1980), the Supreme Court held that the use of a defendant's pre-arrest silence to impeach his credibility on cross-examination does not violate the Fifth or Fourteenth Amendments.

In the present case, defendant acknowledges in his appellate brief that it is unclear when he was read his *Miranda* rights. There is no evidence that defendant had been read his *Miranda* rights at the time of his pre-arrest silence and inaction referred to by the State in closing arguments. Instead, it appears that defendant was arrested at the scene of the crime and then given *Miranda* warnings sometime later at the police station. Consequently, defendant's federal constitutional rights were not violated by the use of his pre-arrest silence regarding self-defense and accident.

However, the analysis does not end here. Indeed, in *Jenkins*, the Supreme Court stated:

Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

*Id.* at 239, 65 L. Ed. 2d at 95 (citations omitted). Accordingly, we look to the North Carolina Supreme Court's opinion in *State v. Lane*, 301 N.C. 382, 271 S.E.2d 273 (1980) to analyze defendant's contention that his rights were violated by the use of any pre-arrest silence in accordance with the rules of evidence formulated by our jurisdiction. *See State v. Westbrooks*, 345 N.C. 43, 64, 478 S.E.2d 483, 496 (1996). In *Lane*, the Supreme Court stated:

"Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. Even so, such prior inconsistent statements are admissible for the purpose of impeachment. . . .

'. . . [I]f the former statement fails to mention a material circumstance presently testified to, *which it would have been natural to mention in the prior statement*, the prior statement is sufficiently inconsistent.' "

*Id.* at 386, 271 S.E.2d at 276 (internal citation omitted).

In the present case, defendant made a number of spontaneous statements to investigators acknowledging that he was in trouble. It would have been natural for defendant to have added that he shot Williams and Holiday in self-defense and Reels by accident. Although defendant agrees with this analysis, he argues that it is not applicable to his case because the State never attempted to impeach him while he testified, but instead raised this issue for the first time in its closing argument when defendant could not explain. However, our Supreme Court has considered this particular issue and resolved it contrary to defendant's position. *See State v. Buckner*, 342 N.C. 198, 223, 464 S.E.2d 414, 428 (1995) (stating "we conclude that defendant's silence about Bivens' guilt, prior to taking the stand, was evidence of an inconsistent statement in this particular case; and it was not error for the prosecutor to make the arguments impeaching defendant's testimony at trial").

Although defendant argues that the State's argument amounted to a violation of constitutional magnitude, we do not agree. In light of *Lane, Buckner* and their progeny, there is no question that a defendant who takes the stand relinquishes some constitutional rights. Defendant had the opportunity during his trial testimony to justify his failure to claim self-defense earlier. We cannot hold the trial court's failure to intervene during the State's closing argument *ex mero motu* was grossly improper.

### B. Post-Arrest Silence

As stated above, it is unclear at what point defendant was given *Miranda* warnings. "The burden of demonstrating error rests upon the appealing party." *State v. McGinnis*, 70 N.C. App. 421, 423-24, 320 S.E.2d 297, 300 (1984). Moreover, when a defendant does not exercise his right to remain silent after receiving *Miranda* warnings, he does

not rely on the implicit assurances embodied in the *Miranda* warnings and has not been induced to remain silent. *See State v. Mitchell,* 317 N.C. 661, 346 S.E.2d 458 (1986).

Here, defendant repeatedly made spontaneous statements which were inconsistent with statements he made at trial. Defendant had the burden of establishing when he was given *Miranda* warnings and could have done so during his testimony or through cross-examination of various State witnesses. He failed to meet his burden. Accordingly, defendant could be impeached during the State's closing arguments with inconsistent statements and silence prior to trial. This assignment of error is overruled.

## VII.

[9] Defendant makes the related argument that his trial counsel's failure to object to those portions of the State's closing argument referencing defendant's failure to claim self-defense to investigators at the time of the offense deprived him of effective assistance of counsel. "A defendant's right to counsel includes the right to the effective assistance of counsel." *State v. Braswell,* 312 N.C. 553, 561, 324 S.E.2d 241, 247-48 (1985) (citing *McMann v. Richardson,* 397 U.S. 759, 771, 25 L. Ed. 2d 763, 773 (1970)). However, a defendant alleging ineffective assistance of counsel must meet a high standard. "When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness." *Id.* (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984)). Specifically, defendant must satisfy a two-part test in order to meet this burden:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* (quoting *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693).

Even if counsel was deficient, "[t]he fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's

STATE v. WASHINGTON

[141 N.C. App. 354 (2000)]

errors, there would have been a different result in the proceedings."
*Braswell*, 312 N.C. at 563, 324 S.E.2d at 248 (citations omitted).

> This determination must be based on the totality of the evidence
> before the finder of fact. . . . [I]f a reviewing court can determine
> at the outset that there is no reasonable probability that in the
> absence of counsel's alleged errors the result of the proceeding
> would have been different, then the court need not determine
> whether counsel's performance was actually deficient.

*Id.* at 563, 324 S.E.2d at 248-49.

In the case at bar, our examination of the record convinces us
that there is no reasonable probability that defense counsel's failure
to object to comments made by the prosecuting attorney affected the
outcome of the trial. The evidence of defendant's guilt was more than
substantial. Although defendant argues that credibility was the cen-
tral issue in the case, the State's evidence refuted defendant's testi-
mony that he fired at Holiday and Williams only after they charged at
him. An expert for the State Bureau of Investigation testified that
while defendant's pistol would leave gunshot residue on an object
located four feet or less away when fired, he found no residue on
either Williams or Holiday. Defendant admitted on cross-examination
that he never saw Holiday or Williams with a weapon. Finally, there
was a back door in close proximity to where defendant was standing
at the time of the shooting, through which he could have retreated if
attacked. In light of this and other evidence of guilt, we are unable to
hold that there was a reasonable probability that a different outcome
would have followed an objection by defendant's trial counsel. This
assignment of error is overruled.

## VIII.

[10] Finally, defendant claims that the trial court erred by not declar-
ing a mistrial *sua sponte* after a bailiff entered the jury room during
deliberations.[1] Although defendant acknowledges in his appellate
brief that the trial court examined the bailiff and determined that he
had not communicated with the jury, defendant argues that despite
these determinations the bailiff's actions "constituted an improper
external influence on the jury" requiring the trial court to declare a
mistrial.

---

1. Defendant also states in his appellate brief that the bailiff entered the jury
room at another time during trial. However, whether the bailiff entered the jury room
at this time is unclear from the transcript, and defendant did not make an objection.

This issue is controlled by section 15A-1061 of the North Carolina General Statutes, which states:

> Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

N.C. Gen. Stat. § 15A-1061 (1999). A motion for a mistrial lies within the discretion of the trial court. *See State v. Billups*, 301 N.C. 607, 272 S.E.2d 842 (1981). "Unless its rulings thereon are clearly erroneous or amount to a manifest abuse of discretion, they will not be disturbed." *State v. Sneeden*, 274 N.C. 498, 504, 164 S.E.2d 190, 195 (1968) (citations omitted). "This is so even when the basis of the motion for mistrial is misconduct affecting the jury." *State v. Gardner*, 322 N.C. 591, 593, 369 S.E.2d 593, 595 (1988); *see also State v. Shedd*, 274 N.C. 95, 161 S.E.2d 471 (1968). Appellate courts are deferential to the trial court's exercise of discretion in this area because a " 'trial judge is in a better position to investigate any allegations of misconduct, question witnesses and observe their demeanor and make appropriate findings.' " *State v. Rutherford*, 70 N.C. App. 674, 677, 320 S.E.2d 916, 919 (1984) (citation omitted).

"Misconduct must be determined by the facts and circumstances of each case . . . ." *Id.* " 'The circumstances must be such as not merely to put suspicion on the verdict, because there was opportunity and a chance for misconduct, but that there was in fact misconduct. When there is merely matter of suspicion, it is purely a matter in the discretion of the presiding judge.' " *Sneeden*, 274 N.C. at 504, 164 S.E.2d at 195 (quoting *Lewis v. Fountain*, 168 N.C. 277, 279, 84 S.E.2d 278, 279 (1915)).

> The great weight of authority sustains the rule that . . . a verdict will not be disturbed because of a conversation between a juror and a stranger when it does not appear that such conversation was prompted by a party, or that any injustice was done to the person complaining, and he is not shown to have been prejudiced thereby, and this is true of applications for new trial by the accused in a criminal case as well as of applications made in civil actions. . . . [A]nd if a trial is really fair and proper, it should not be set aside because of mere suspicion or appearance of irregularity which is shown to have done no actual injury. Generally

speaking, neither the common law nor statutes contemplate as ground for a new trial a conversation between a juror and a third person unless it is of such a character as is calculated to impress the case upon the mind of the juror in a different aspect than was presented by the evidence in the courtroom, or is of such a nature as is calculated to result in harm to a party on trial. The matter is one resting largely within the discretion of the trial judge.

*Id.* (alteration in original) (citation omitted).

In the case at bar, there was no misconduct affecting the jury. Rather, the evidence showed that when the intrusion by the bailiff became known to the court, the trial judge put the bailiff under oath, determined that the bailiff had, without authorization of the court, knocked on the door of the jury room, that he did so because another bailiff had asked him to retrieve some magazines for defendant, that the bailiff said nothing to the jurors and the jurors said nothing to him, and that he heard no deliberations and had no other contact with the jurors. Neither the State nor defendant accepted the court's invitation to make further inquiry of the bailiff, and defendant did not then seek a mistrial. In light of this investigation and the circumstances surrounding the bailiff's entry, the trial court did not abuse its discretion in failing to declare a mistrial *sua sponte. See, e.g., Gardner,* 322 N.C. 591, 369 S.E.2d 593 (finding no error where trial court denied defendant's motion for a mistrial based upon a colloquy that took place between the bailiff and the jury foreman after the verdict was reached but before it was announced in open court); *Billups,* 301 N.C. 607, 272 S.E.2d 842 (finding that denial of defendant's motion for mistrial was proper where prosecuting witness entered the jury room during a recess at the conclusion of trial but prior to the charge of the court to use the bathroom and did not communicate with any of the jurors); *Sneeden,* 274 N.C. 498, 164 S.E.2d 190 (holding that trial court did not err in denying defendant's motion for mistrial where jury foreman asked bailiff how quickly a parole was possible, bailiff replied that it had nothing to do with the evidence, and bailiff reported the communication to the trial judge); *Shedd,* 274 N.C. 95, 161 S.E.2d 471 (finding no abuse of discretion in denying defendant's motion for mistrial where witness entered into a discussion with other witnesses and spectators regarding the incidents concerning the charges against defendants in the hearing of the jurors); *Rutherford,* 70 N.C. App. 674, 320 S.E.2d 916 (determining no abuse of discretion in denying defendant's motion for mistrial where juror had a conversation with plaintiff's witness during lunch recess

about whether juror correctly understood witness' testimony that he was retired from the military and whether they knew some of the same people). Accordingly, this assignment of error is overruled.

No error.

Judges GREENE and MARTIN concur.