BRYANT, Judge.
Where the trial court did not err in admitting defendant's confession, lay opinion testimony, or statements defendant made to a detention officer, we find no error in the judgment of the trial court.
In 2012, Rebecca[1] moved in with her mother and her mother's boyfriend, defendant John Edward Greene, who lived in a three-bedroom trailer in Deep Gap, North Carolina. About a year later, Rebecca's relationship with defendant grew difficult; defendant would call Rebecca "fat" and "ugly" and often brought Rebecca to tears. When Rebecca was about fourteen years old, he also grew violent towards her, hitting her with his "backhand," "enough for [her] mind just to black out a little bit...." On one occasion he chased her out the door, pulled her back inside by the hair, and hit her with his belt "anywhere he could" until she "was on [her] back, frightened." Defendant also made comments about her developing breasts and her starting her period. When Rebecca was around fifteen years old, he also tried to give her pornographic magazines which Rebecca did not want and thought were "disturbing."
On Saturday, 3 January 2015, Rebecca was home alone with defendant while her mother was at work. Rebecca was not feeling well, but defendant insisted they play a game of chess. Defendant had Rebecca get alcohol from the refrigerator and, according to Rebecca,
[h]e had me grab a couple of Mason jars, and we played the game and every time you lost a piece you took a shot. And I kept losing pieces and so I kept having to drink, and eventually I just felt really sick like even worse than I was. So I went to lay [sic] down.
Defendant was also drinking. They played chess for about an hour until Rebecca went to shower and lie down in her bedroom. Rebecca was lying on her stomach when defendant came in, climbed on top of her, and inserted his penis into her rectum and had anal sex with her. He ejaculated inside her and asked her "if it felt good." After defendant left, Rebecca was afraid and continued to lie there.
When Rebecca's mother, Elizabeth, returned home around 5:30 or 6:00 p.m. that day, Rebecca tried to tell her mother about the incident, saying, "I need to talk to you, Mom" and "I don't feel very well." The two did not get to talk, however, because defendant "was right there" every time Rebecca tried to talk to her mom. Elizabeth did notice that Rebecca's bed was disheveled and the room "smelled weird," "kind of like intercourse had happened possibly." Rebecca eventually told a close friend at school about the incident who, in turn, accompanied her to the school counselor's office.
On 5 January 2015, Watauga Deputy Sheriff Captain Jaska Rominger received a call from the Department of Social Services ("DSS") concerning a report of possible sexual abuse involving a fifteen-year-old female. Captain Rominger then scheduled an interview with defendant.
From the interview on 7 January 2015, Captain Rominger testified that defendant told her the following:
A.... He told me he hadn't drank anything in a long time but that the last time he had drank was Saturday, January the 3rd of 2015. He told me that he and [Rebecca] both were feeling a buzz that day and that [Rebecca's] speech was slurred but that she was handling herself well. He said that [Rebecca] took a shower and went to her room. He told me that he checked on her two times at ten-minute intervals and that she was okay. He said he opened the door and checked and that she was fine. He let her sleep because she was kind of sick and he also told me that [Elizabeth] was kind of sick also. He said that they drank for about two hours. He said that this was the first time he and [Rebecca] had drank without Elizabeth being around. Told me that he had never made any sexual comments to [Rebecca] but that he had made statements to [Elizabeth] about [Rebecca's] body and her clothing. He said that he told [Elizabeth] that [Rebecca] was getting fat and big, and that he also talked about [Rebecca] and her boobs getting bigger, and that he had told [Rebecca] to exercise and that maybe her clothes would fit better.
He told me there was no reason for his DNA to be on any of her clothing, or no reason that her bed should have any DNA on it. And he told me that he didn't know why she would say that there was any sexual contact between the two of them.
Selena Moretz with the Children's Advocacy Center of the Blue Ridge ("CAC") also received a referral from law enforcement and DSS regarding the allegations of sexual abuse. Moretz subsequently interviewed Rebecca, which interview was video recorded. At trial, the video was played for the jury.
On 14 January 2015, defendant was interviewed again by Captain Rominger and Agent Marc Sharpe of the State Bureau of Investigation. Defendant began to cry and confessed to having anal sex with Rebecca. Because the recording of this interview was video only and without audio, and no written statement was taken from defendant, Captain Rominger testified as follows:
A. He started to talk about what had happened; he began to cry and started to tell me about what had happened.
....
Q. What did he tell you happened? What did ... [d]efendant tell you happened?
....
A. [Defendant] told me that he and [Rebecca] had been drinking and they were both buzzed, and they said he went into her bedroom and that he put his penis in her butt. He stated that his boxers were wet from ejaculation, he said that he did not mean to hurt [Rebecca], and that he usually didn't drink alcohol.
Q. The words that you've said to the jury that he said he put his penis in her butt, are those your words or his words?
A. Those were his words.
Q. Could you describe his demeanor as you, as he revealed these things?
A. Yes, he was emotional, he would cry at times, and at times he wouldn't. He, because he was crying, of course, he was wiping, he would wipe his nose with his shirt and his hand.
Shortly thereafter, a warrant was issued for defendant's arrest.
From 16 to 19 February 2016, defendant was tried by jury in Watauga County Superior Court before the Honorable Alan Z. Thornburg, Judge presiding, upon a bill of indictment charging him with statutory sexual offense with a person who is 13, 14, or 15 years old by a defendant at least six years older than the victim. Upon return of a guilty verdict, defendant was sentenced to 221 to 326 months and ordered to register as a sex offender for a period of thirty years. Defendant gave notice of appeal in open court.
_________________________
On appeal defendant contends the trial court erred in (I) admitting defendant's alleged confession of 14 January 2015 because it was not voluntary; (II) admitting opinion testimony by a lay witness; and (III) denying defendant's motion to exclude the incriminating statements.
I
Defendant first argues that the trial court erred in admitting defendant's confession of 14 January 2015 because it was not voluntary. We disagree.
Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." State v. Cooke , 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982) (citations omitted). "Conclusions of law are reviewed de novo and are subject to full review." State v. Biber , 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) (citations omitted). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." Id. (quoting State v. Williams , 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) ).
Defendant filed a motion in limine to exclude any mention of a polygraph test, post-test interview, and unrecorded statements, and argued that any statement made by him should be prohibited by statute; defendant specifically referred to N.C. Gen. Stat. § 15A-211,[2] which defendant asserts "requires the creation of a visual and audio recording, when reasonable [sic] feasible, of custodial interrogations conducted during the course of the investigation of Class B-1 felonies...." (Emphasis added). During the suppression hearing, defense counsel also argued that defendant's confession "wasn't completely voluntary" because the interview following the polygraph test went from "being voluntary to custodial requiring Miranda. And also requiring [for the interview] to be recorded for its entirety."[3]
On appeal, defendant does not point to any particular finding of fact as not being supported by the evidence. Rather, he appears to challenge all of the trial court's findings by stating that "[a]t a minimum, the court heard conflicting evidence on the circumstances giving rise to [defendant's] statements." However, "[i]n the event of conflicting evidence, the determination of the trial court will not be disturbed." State v. Cagle , 182 N.C. App. 71, 78, 641 S.E.2d 705, 710 (2007) (citing Deer Corp. v. Carter , 177 N.C. App. 314, 324-25, 629 S.E.2d 159, 167 (2006) ). As defendant asserts that the trial court heard "conflicting evidence" regarding the voluntariness of his confession, we will not disturb the trial court's findings of fact. See Cooke , 306 N.C. at 134, 291 S.E.2d at 619.
The trial court's findings regarding defendant's motion in limine to exclude certain evidence are, in relevant part, as follows:
1. Captain Rominger is a law enforcement officer holding the title of Captain with the WCSO. Marc Sharpe is a law enforcement officer holding the title of Special Agent with the SBI.
2. Captain Rominger interviewed ... Defendant on January 7, 2015, at the WCSO, regarding allegations of a sex offense against a minor. During that interview, ... Defendant agreed to take a polygraph examination at a later date.... Defendant was not in custody and freely left the WCSO at the conclusion of the interview .
3. Captain Rominger and Agent Sharpe interviewed ... Defendant at the WCSO on January 14, 2015, for the purpose of investigating allegations of a sex offense against a minor.
4. ... Defendant was not transported to the WCSO by law enforcement vehicle for the January 14, 2015, interview.
5. Prior to beginning the interview, ... Defendant signed a "Polygraph Release Form," in which he acknowledged the following:
a. That he voluntarily -and without threats, duress, coercion, force, promises of immunity, or reward-knowingly and understandingly agreed to take the polygraph;
b. That the polygraph included interviews before and after its completion;
c. That he was not under arrest or in custody, and not required to take the polygraph; and,
d. That he voluntarily requested the polygraph .
6. ... Defendant initialed and signed each of the provisions noted in Paragraph Five above.
7. Agent Sharpe advised ... Defendant he was "free to leave at any time" before beginning the polygraph process.
8. ... Defendant was not threatened or coerced to submit to the polygraph.
9. ... Defendant was not promised anything, including leniency, in exchange for taking the polygraph.
10. During the interview, ... Defendant did not appear to be under the influence of any impairing substance, did not request an attorney, did not request to stop the polygraph or interview process, did not refuse to answer any questions, and did not request any food or water.
11.The door to the interview room was closed for nearly the entire interview; however, ... Defendant was allowed to leave the interview room prior to submitting to the polygraph to use the restroom, and freely returned to the interview review [sic] without a police escort.
12. ... Defendant was not in handcuffs at any time during the interview.
13. Captain Rominger wore civilian attire during the interview.
14. Agent Sharpe wore civilian khaki pants and a polo shirt on which "SBI" was printed.
15. Captain Rominger placed a chair in front of the door to the interview room when she entered the room. The room was described as "small" and ten feet wide by ten feet long.
16. ... Defendant appeared to be crying several times during the interview. Captain Rominger and Agent Sharpe placed their hands on ... Defendant several times during the interview in what they described as an attempt to "console" ... Defendant.
17. ... Defendant was permitted to leave the WCSO after the interview and was not arrested until one week later on January 21, 2015.
18.The post-polygraph interview was recorded on video; however, the audio was unintentionally not recorded without the knowledge of Captain Rominger or Agent Sharpe.
(Emphasis added). The trial court found the statements-but not the polygraph results-admissible.
The trial court concluded that "[d]efendant was not in custody when he was interviewed by Captain Rominger and Agent Sharpe on January 14, 2015." Because competent evidence supports the trial court's findings of fact which in turn support the trial court's conclusion that defendant was not in custody, defendant's statutory argument as to a recording requirement must fail, where those requirements apply only to "custodial interrogation."[4] For the foregoing reasons, the trial court did not err in admitting defendant's confession. Defendant's argument is overruled.
II
Next, defendant argues the trial court erred in admitting opinion testimony by a lay witness regarding the odor in the bedroom where the assault occurred. We disagree.
"[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." State v. Washington , 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000) (citation omitted). Accordingly, "we may reverse only upon a showing that the trial court's admission of [the witness's] testimony was so arbitrary that it could not have been the result of a reasoned decision." State v. Yelton , 175 N.C. App. 349, 353, 623 S.E.2d 594, 596 (2006) (citation omitted).
Lay opinion testimony or inferences are admissible where such testimony is "rationally based on the perception of the witness" and is "helpful to a clear understanding of [the witness's] testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2015). "[U]nder this rule, 'a witness may state the instantaneous conclusions of the mind as to the appearance, condition, or ... physical state of ... things, derived from observation of a variety of facts presented to the senses at one and the same time.' " State v. Mills , 221 N.C. App. 409, 414, 726 S.E.2d 926, 930 (2012) (alterations in original) (quoting State v. Braxton , 352 N.C. 158, 187, 531 S.E.2d 428, 445 (2000) ).
In the instant case, Rebecca's mother testified about the interactions she had with both defendant and Rebecca on the date of the incident. She described how she went into Rebecca's bedroom and noted that the bed was "disheveled" and that she detected a "weird" or "odd" smell. She testified, "I really can't put the smell into words but if I could it would've probably been, um ... a rough [smell] kind of like an intercourse had happened possibly."
Rebecca's mother was describing the condition of Rebecca's room, both from a visual perspective and based on her sense of smell. This type of testimony is precisely the type contemplated by Rule 701 for lay witnesses: Rebecca's mother "state[d] the instantaneous conclusions of [her] mind as to the appearance, condition, or ... physical state of ... things, derived from observation of a variety of facts presented to the senses at one and the same time." See id. at 414, 726 S.E.2d at 930 (quoting Braxton , 352 N.C. at 187, 531 S.E.2d at 445 ). In this case, the lay testimony was based upon sensory perceptions, including Rebecca's mother's sense of smell, upon entering her daughter's bedroom. She did not offer an opinion regarding her daughter's behavior or a diagnosis. Cf. State v. Kelly , 118 N.C. App. 589, 594-97, 456 S.E.2d 861, 866-68 (1995) (involving testimony related by parents of the victims of alleged sexual abuse that were akin to expert opinions, including opinions based on books and articles read by the parents in order to determine whether their children had been abused). Rather, Rebecca's mother merely related her observations of the physical space-the bedroom-to the court. Accordingly, the trial court did not abuse its discretion in admitting this testimony. Defendant's argument is overruled.
III
Lastly, defendant argues the trial court erred in denying defendant's motion to exclude the incriminating statements elicited from him by the county's chief jailer, Jaunita Miller. Specifically, defendant contends it was error to admit these statements as the jailer failed to advise defendant of his Miranda rights, even though he remained in custody at the time the statements were made. We disagree.
Because the lack of Miranda warning was not among the bases for defense counsel's motion to suppress defendant's statement to the jailer in the motion in limine, and because counsel failed to object to the statement's admission at trial, this issue is subject to dismissal. However, because defendant distinctly argues plain error, we review this issue for plain error only. "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." State v. Jordan , 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).
"Volunteered statements of any kind are not barred by the Fifth Amendment...." Miranda v. Arizona , 384 U.S. 436, 478, 16 L.Ed. 2d 694, 726 (1966). " 'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Rhode Island v. Innis , 446 U.S. 291, 300, 64 L.Ed. 2d 297, 307 (1980).
On 21 January 2015, the date defendant was arrested, Juanita Miller was working as the chief detention officer at the Watauga County Sheriff's Department. When defendant was brought into the booking area near Miller's office, Miller saw him sitting there and asked him what he was charged with. Defendant responded by saying "It's bad, it's real bad, I did something real bad."
Defendant argues that Miller abused a position of trust as she was "the mother of a childhood friend" of defendant's. Therefore, defendant argues, Miller's question "What are you charged [with]?" and defendant's response that he had done something "bad," was coerced by virtue of this alleged relationship. However, there is no evidence to support this contention (Miller asserted having "really no relationship" with defendant), and there is also no evidence that Miller intended to elicit an incriminating response, particularly where, as here, Miller was working at the time as chief detention officer.
In concluding that defendant's statement could be admitted, the trial court made the following findings of fact, which defendant has failed to establish are not supported by the evidence:
THE COURT: All right. With regard to the voir dire examination of Ms. Juanita Miller, Sheriff's department detention officer, her statements regarding what the Defendant told her while in jail, the Court finds that, uh, further Miranda warnings were not required as a prerequisite to the admissibility of this statement made by the Defendant. The statement was made in response to a question, "What are you charged from [sic]?" And that question would be a routine informational question which would normally be asked by a detention officer in performance of that officer's duties, and the response of the Defendant was not an answer to the question. The question itself, being a routine informal question, was not reasonably likely to elicit an incriminating response from the Defendant. And of course, she is a detention officer and was not in the process of investigating any matter with relation to this, this crime, but simply in furtherance of her duties. And again, the answer was not in response and it was a routine question, as the Court has stated.
In considering the circumstances under which it was obtained, there's no violation of the Defendant's 5th Amendment right or any other violation that would require that it not be admitted.
The trial court found and we agree defendant was not entitled to Miranda warnings prior to the question by the chief jailer. Thus, on this record, defendant is unable to establish that the trial court committed error, plain or otherwise, in admitting this statement. Therefore, defendant's argument is overruled.
In conclusion, where the trial court did not err in admitting defendant's confession, lay opinion testimony, or statements defendant made to a detention officer, we find no error in the judgment of the trial court.
NO ERROR.
Report per Rule 30(e).
Judges INMAN and ZACHARY concur.

A pseudonym is used to protect the identity of the minor child in this case.

N.C. Gen. Stat. § 15A-211 states that
[a]ny law enforcement officer conducting a custodial interrogation in an investigation relating to any of the following crimes shall make an electronic recording of the interrogation in its entirety: any Class A, B1, or B2 felony; and any Class C felony of rape, sex offense, or assault with a deadly weapon with intent to kill inflicting serious injury.
Id. § 15A-211(d) (2015) (emphasis added).

In his appellate brief, defendant contends trial counsel failed to object to defendant's confession at trial. To the contrary, defense counsel did object to the admission of defendant's confession at trial: "[Defense Counsel]: Your Honor, for the record I would object based on all the grounds alleged in the pretrial motions. THE COURT: Overruled based on the Court's previous ruling." Although not specifically listed as one of "the grounds alleged in the pretrial motions" filed with the trial court, the issue of the voluntariness of defendant's confession was argued during the pretrial motions hearing.

Moreover, even assuming defendant was subjected to a custodial interrogation, the fact that the audio component of the video-recorded statement was unknowingly inoperative would not necessarily make the statement inadmissible if the video alone could be considered an electronic recording of that statement.