ZACHARY, Judge.
Michael Barbour (defendant) appeals from the judgments entered upon his convictions of rape of a child, sex offense against a child, and two charges of taking indecent liberties with a child, with all offenses alleged to have been committed against the minor victim, "Rachel."[1] On appeal, defendant argues that the trial court erred by allowing witnesses to vouch for Rachel's credibility, by restricting defendant's cross-examination of certain witnesses, and by failing to intervene ex mero motu during the prosecutor's closing argument. After careful review of defendant's arguments and consideration of the record on appeal and the applicable law, we conclude that defendant had a fair trial, free of reversible error, and that he is not entitled to relief.
Factual and Procedural History
On 17 August 2015, defendant was indicted in Johnston County No. 15 CRS 53877 on charges of rape of a child and sex offense against a child. On the same day, defendant was indicted in Johnston County Nos. 15 CRS 53788 and 53789 with two counts of taking indecent liberties with a child.
The charges against defendant were tried beginning on 12 September 2016. The State's evidence tended to show, in relevant part, the following: Rachel testified that she was twelve years old and in sixth grade, and that she lived with her older sister and brother-in-law. When Rachel was seven or eight years old, she lived with her mother in a mobile home park in Kenly, North Carolina. Defendant lived next door, and Rachel's mother allowed defendant to babysit Rachel. Rachel testified that defendant raped her on multiple occasions. She described incidents that occurred in locations in his trailer or in hers, in which defendant committed sexual assaults on Rachel, including putting his finger in her vagina and forcing her to have intercourse. Rachel testified that during these incidents defendant made "weird noises" and that later her private parts were sore and sometimes bled. On other occasions, defendant forced her to perform oral sex on him, or put his mouth on her private parts. Defendant had firearms and threatened to shoot her if she told anyone about the abuse.
Rachel testified that her mother was often gone for days or weeks and that she never told her mother about defendant's abuse. When she was about eight years old, she and her mother lived with defendant, and he often forced her to engage in intercourse, touched her breasts and genitals with his hands or mouth, or forced her to engage in other sexual acts, including oral sex. Defendant eventually ordered Rachel and her mother to leave, after which they stayed with a man named Gerhard Hauber. Rachel had previously been subjected to sexual abuse by Mr. Hauber, including forcible rape and other sexual offenses.
When Rachel was in fourth grade and was living with Mr. Hauber, she wrote a letter to her teacher, Ms. Massengill, in which she told the teacher about some of the sexual abuse that she had experienced. Ms. Massengill shared the letter with the school counselor, with whom Rachel also discussed her experiences. The school counselor contacted Child Protective Services (CPS), and Rachel was interviewed by social workers, including Danielle Doyle. Initially, Rachel only told the school counselor and Ms. Doyle about Mr. Hauber's sexual abuse, but when she felt safe, she also told them about defendant's sexual abuse. After Rachel told Ms. Doyle about defendant's abuse, she was placed in a foster home with a woman whom Rachel called "Ms. Shirley." While Rachel was living with Ms. Shirley, she was examined by a doctor and interviewed by another person, whom she told about having been abused by defendant and by Mr. Hauber.
Stephanie Liu testified that she was a school social worker with the Wake County school system, and was employed at Conn Elementary School, which Rachel had previously attended. After Ms. Massengill told Ms. Liu about the letter Rachel had written in class, Ms. Liu met with Rachel in her office. Rachel told Ms. Liu that a man that with whom she lived had touched her breast and made her uncomfortable. Ms. Liu reported this to CPS, which assigned Ms. Doyle to Rachel's case. Ms. Doyle came to the school to meet with Rachel a day or two later. Ms. Liu met with Rachel several times over the next few weeks. At first, Rachel sat silently looking down at the floor and crying. Rachel told Ms. Liu that she was "not supposed to talk" with her, and that her mother would hurt her if she shared information with Ms. Liu. After several weeks, Rachel told Ms. Liu about defendant abusing her.
Ms. Doyle testified that she investigated Rachel's case for CPS. Rachel was afraid to continue living with Mr. Hauber, so she and her mother stayed at the Salvation Army shelter for a few weeks. After Rachel moved from Mr. Hauber's house, Ms. Doyle spoke with her at school and Rachel told Ms. Doyle about defendant's sexual abuse. Ms. Doyle's testimony corroborated Rachel's with regard to the acts in which defendant and Mr. Hauber had forced her to engage. Ms. Doyle also testified that Rachel's mother did not cooperate with the safety plan developed by CPS. As a result, "the Department of Social Services (DSS) in Wake County [was given] custody" of Rachel, who was placed with a foster family. Four or five days later, Ms. Doyle took Rachel to the SAFEchild Advocacy Center, in Raleigh (hereafter "SAFEchild"), where Rachel had a physical examination and took part in a recorded interview.
Sara Kirk testified that she was a social worker who was employed by UNC Hospitals as the coordinator of an outpatient clinic for the treatment of child abuse. She previously worked at SAFEchild, where she interviewed children. Ms. Kirk was accepted without objection as an expert in the field of social work specializing in child maltreatment and forensic interviewing. On 4 May 2015, Ms. Kirk conducted a videotaped interview of Rachel at SAFEchild. The recording was played for the jury without objection. During the interview, Rachel told Ms. Kirk in detail about being sexually abused by defendant and by Mr. Hauber.
Jessica Frisina testified that she was employed as "a foster care social worker with Wake County Human Services." Ms. Frisina investigated the background of Rachel's mother in the course of assessing whether Rachel might be reunited with her mother. Ms. Frisina learned that Rachel's mother was sexually abused as a child; that she had significant mental and emotional issues; that an older sibling of Rachel's was sexually abused by Rachel's mother's ex-husband; and that in 2009 DSS had investigated a report that Rachel's mother was living with a known sex offender. When Rachel was first placed in the custody of DSS, she was taking a number of psychiatric medications. After a review by medical personnel, Rachel's prescribed medications were reduced to a prescription used to treat ADHD, and Prozac, which was prescribed to treat PTSD. Testing indicated that Rachel had an IQ of 76 and suffered from anxiety and depression.
Stacey Drake testified that she was a licensed clinical social worker. At the time of trial, she was in private practice, after working for 30 years with "Wake County and the sex abuse team." Over defendant's objection, Ms. Drake testified as an expert "in social work as well as trauma-focused cognitive behavioral therapy as it relates to child maltreatment." Ms. Drake provided counseling therapy to Rachel from May 2015 until June 2016. Ms. Drake testified that Rachel had symptoms associated with sexual abuse, specifically that "[s]he was not sleeping, she was fearful, she had clinging behavior, she had physical complaints, she had intrusive thoughts and flashbacks." Rachel spoke with Ms. Drake in detail about incidents of sexual abuse from both defendant and Mr. Hauber. In her discussions with Ms. Drake, Rachel clearly distinguished between past events involving defendant and those involving Mr. Hauber. Ms. Drake diagnosed Rachel as suffering from anxiety and PTSD.
Ms. Drake also testified that after Rachel met her sister, Rachel became impatient with the delay in the process of placement with her sister. During this period, Rachel engaged in oppositional behavior and made false statements about her foster family and social worker. Eventually, Rachel was briefly admitted to Holly Hill Hospital for treatment where she was diagnosed with oppositional defiant disorder, bipolar disorder, and post-traumatic disorder. Ms. Drake testified that on the basis of her training, experience, and interactions with Rachel, she had the opinion that the behaviors Rachel exhibited and her statements were "consistent with" sexual abuse. On cross-examination, Ms. Drake testified that Rachel had identified five previous boyfriends of her mother's and told Ms. Drake that two of them had not touched her inappropriately.
Dr. Elizabeth Witman testified that she was a pediatrician, was board-certified in the specialty of child abuse pediatrics, was employed at WakeMed Children's Hospital as a general pediatrician, and was the medical director at SAFEchild, where Rachel was examined and interviewed. Over defendant's objection, Dr. Witman was accepted as an expert in general pediatrics specializing in child maltreatment. On 4 May 2015, Dr. Witman examined Rachel at SAFEchild, when Rachel was ten years old. Dr. Witman testified without objection that Rachel was "remarkable for how she could provide information to me." Dr. Witman noted that Rachel was overweight, and that the medications she took should be reviewed. Rachel's external genitalia appeared normal, and Dr. Witman explained that "in the vast majority of cases[,] children don't have any abnormal physical findings even though they have been physically abuse[d]." Over defendant's objection, Dr. Witman testified that her opinion was that Rachel's "normal examination was consistent with the history of sexual abuse that can include penile-vaginal penetration." On cross-examination, Dr. Witman testified that a normal examination was "consistent with abuse or no abuse."
Amber Pero, a social worker with the Johnston County DSS, testified that on 2 July 2013 she visited defendant's home as part of the investigation into Rachel's allegations of sexual abuse. Defendant told her that he met Rachel and her mother in 2012 when they lived in the trailer next to his, and that he had babysat Rachel. At some point, Rachel and her mother moved in with him. Rachel's mother did not contribute to paying the rent, and he asked them to move out on 1 November 2015. He told Ms. Pero that he felt guilty about asking them to leave and that "he missed [Rachel] a lot particularly." Defendant also said that he and Rachel "liked to cook together. He had taught her how to cook. They rode bikes together, hiking and shopping at the mall and helping her with her homework," and that defendant felt that they had "a real connection." Defendant told Ms. Pero that he had a pending DWI charge and that "he had obtained the [DWI] because he missed [Rachel] a whole lot."
When Ms. Pero asked defendant about the allegations of sexual abuse, defendant told her that at one time Rachel had a yeast infection and that after Rachel bathed he "could still smell her," so he asked her to sit on the toilet. He then told her to spread her legs so that he could apply diaper ointment to her vaginal area. Rachel would walk around the trailer wearing nothing but a towel, and they slept in the same bed. Sometimes when he awakened, Rachel was "wrapped around him" but they never had sexual contact. Defendant also told Ms. Pero that he was impotent as a result of diabetes.
Defendant's evidence tended to show, in relevant part, the following: Defendant testified that he was 58 years old. He generally denied having any sexual contact with Rachel, and specifically denied each of the acts to which she had testified. Defendant met Rachel's mother in 2012, when they lived next door. During the summer of 2012, defendant sometimes babysat Rachel, and "[f]or a period of time [he] actually felt like a parent to [Rachel]." In March of 2014, Rachel and her mother moved into defendant's trailer. About six months later, defendant asked them to move out because Rachel's mother was not making any financial contribution to defendant's living expenses. Defendant denied drinking alcohol or smoking marijuana in front of Rachel.
Defendant also testified about an incident in which he examined Rachel's genitalia and applied ointment to treat a yeast infection. Defendant told the jury that during an evening when he was babysitting Rachel, he decided that she needed a bath. He turned on the shower and told Rachel to "make sure you wash your bottom good." Defendant testified further that:
She took a bath and she got out and she had the towel wrapped around her and I could still-it was a smell that I couldn't identify. I said [Rachel], did you wash your bottom? She said a little bit. I said what you mean a little bit? She said well, it hurts.... I said would you mind if I look at it to see what's wrong. She kind of looked at me kind of funny, you know, I said well, does your mama know about it? She said no, I hadn't told her. I said do you mind if I look. So, she climbed up on the commode and spread her legs and I looked and ... it was just red and angry looking.... So, I said look, I'm going to doctor you up and take care of it. When your mama calls on her break I'm going to tell her about it and she needs to take you to the doctor. So, I got her with some diaper rash cream that I had at the house, made her put on cotton underwear. And when her mama called between eleven and twelve, I told her mama.
Defendant testified that he did not do this for sexual gratification but that he "looked at that as [him] being a responsible adult and looking after a child in need of [his] care."
On cross-examination, defendant testified that he had a prior conviction for assault on a female, arising from an incident between defendant and his ex-wife. He owned a shotgun and a pistol. Defendant cared for his mother from 2008 until her death in 2009. Defendant testified that when his mother died, he experienced her absence as a "big hole," and that when he began caring for Rachel "all of a sudden that hole is filling back up." Defendant thought that he and Rachel had "a very special relationship." They spent a lot of time together and Rachel sometimes spent the night, even before she and her mother moved into his home. Defendant thought Rachel was a "sweet girl" who was "confused." Defendant regarded Rachel as a daughter and would introduce her to others as his daughter.
Ms. Angie Peedin testified that she met defendant in 1996, and that they had a relationship for six years. During their relationship, defendant spent time with Ms. Peedin's four young children. Ms. Peedin had no concerns about defendant's interactions with her children. She testified that she had known defendant for twenty years, and that he had a reputation in his community for being honest.
On 16 September 2016, the jury returned verdicts finding defendant guilty of rape of a child, sexual offense against a child, and two counts of taking indecent liberties with a child. The trial court sentenced defendant to a term of 300 to 420 months' imprisonment for rape of a child. The remaining charges were consolidated for the purpose of sentencing, and defendant was sentenced to 300 to 420 months' imprisonment on those charges, to be served at the expiration of the sentence for rape of a child. Defendant gave notice of appeal in open court.
Testimony of Ms. Kirk and Ms. Drake
Defendant first argues that the trial court committed reversible error by allowing "social workers to vouch for Rachel's credibility by offering opinions that her disclosures were consistent with sexual abuse." We have carefully reviewed this argument and conclude that defendant is not entitled to relief.
Expert Testimony in Child Sex Abuse Cases: Legal Principles
A trial court may admit expert testimony at trial, pursuant to N.C. Gen. Stat. § 8C-1, Rule 702(a) (2016). This statute provides in relevant part that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion[.]"
"Such testimony is admissible if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue,' N.C.G.S. § 8C-1, Rule 702 (2009)," which it will not do unless " 'the opinion expressed is ... really one based on the special expertise of the expert, that is, ... the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact[.]' " State v. Lane , 365 N.C. 7, 27, 707 S.E.2d 210, 223 (2011) (quoting State v. Wilkerson , 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978) ). In the context of prosecutions for child sexual abuse, " 'our appellate courts have consistently held that the testimony of an expert to the effect that a prosecuting witness is believable, credible, or telling the truth is inadmissible evidence.' " State v. Dick , 126 N.C. 312, 315, 485 S.E.2d 88, 89 (1997) (quoting State v. Bailey , 89 N.C. App. 212, 219, 365 S.E.2d 651, 655 (1988) ). Thus, "[a]n expert witness may not attest to the victim's credibility, as he or she is in no better position than the jury to assess credibility." In re T.R.B. , 157 N.C. App. 609, 617, 582 S.E.2d 279, 285 (2003) (citing Bailey , 89 N.C. App. at 219, 365 S.E.2d at 655 (other citation omitted) ), disc. review improvidently allowed, appeal dismissed by In re T.R.B ., 358 N.C. 370, 595 S.E.2d 146 (2004). In State v. Stancil , 355 N.C. 266, 559 S.E.2d 788 (2002), our Supreme Court drew a distinction between an expert's testimony, given in the absence of any supporting physical evidence, that a child has in fact been sexually abused, and testimony that the child exhibited characteristics consistent with those of children who had been abused:
In a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has in fact occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith.
Stancil , 355 N.C. at 266-67, 559 S.E.2d at 789 (citations omitted) (emphasis omitted) (citing Trent; and State v. Grover , 142 N.C. App. 411, 543 S.E.2d 179 (2001) ). In sum, an expert witness may not offer testimony that expresses an opinion on a witness's credibility, because (1) an expert is in no better position than a layperson to assess a person's credibility, and (2) credibility is an issue to be determined by the fact-finder.
Expert testimony vouching for a witness's credibility has been held to be inadmissible in a variety of factual contexts including, inter alia , testimony from a social worker that she "substantiated" the victim's claim of sexual abuse; testimony of a counselor that if a child provides "specific details it enhances [the child's] credibility"; testimony of a pediatrician that 70 to 75 percent of children who are abused exhibit no physical findings and that the pediatrician placed the victim "in that category"; a social worker's testimony that she had "confirmed" the witness's report of sexual abuse; testimony from an expert in pediatric gynecology that she had made a "definite" diagnosis of sexual abuse; and testimony from a doctor that it was "probable" that the victim had been sexually abused.[2] Thus, testimony may be held to be an impermissible comment on a witness's credibility even if the expert does not explicitly state that the witness was believable.
On the other hand, as discussed above, an expert witness may testify about characteristics, behavior, or symptoms that have been determined to be associated with children who are sexually abused, and may offer an expert opinion as to whether the behavior of a child is consistent with such symptoms or characteristics. For such testimony to be admissible, the expert need not articulate a comprehensive set of traits of abused children, and is not required to use the word "profile." See, e.g., State v. Purcell , 242 N.C. App. 222, 774 S.E.2d 392 (2015) (finding no error in allowing pediatrician to testify that it was not uncommon for an abused child to delay reporting anal intercourse); State v. Davis , 368 N.C. 794, 785 S.E.2d 312 (2016) (testimony about characteristics of abused children constituted expert opinion subject to discovery, notwithstanding the fact that the experts did not characterize this evidence as a "profile"). Ultimately, the question of whether particular testimony amounted to improper vouching for a witness must be decided on a fact-specific basis:
Whether sufficient evidence supports expert testimony pertaining to sexual abuse is a highly fact-specific inquiry. Different fact patterns may yield different results. We agree with the State that "reasonable jurists continue to disagree over how or whether the rule discussed in Trent applies to different situations." However, the rule has remained constant. Before expert testimony may be admitted, an adequate foundation must be laid.
Chandler , 364 N.C. at 318-19, 697 S.E.2d at 331 (citing State v. Hammett , 361 N.C. 92, 95-97, 637 S.E.2d 518, 521-22 (2006) ) (other citations omitted).
Discussion
In this case, defendant has challenged testimony offered by two of the State's witnesses, Ms. Kirk and Ms. Drake. We will consider the arguments as to each witness separately. First, defendant contends that Ms. Kirk's testimony that Rachel's "disclosure was consistent with child sexual abuse" was an inadmissible comment upon Rachel's credibility. Upon careful review, we conclude that the challenged testimony was inadmissible, but that it was not sufficiently prejudicial to warrant reversal of defendant's convictions.
The testimony to which defendant objects occurred during the following portion of the trial:
PROSECUTOR: Okay. And based upon your training, education and experience and based upon your interview with [Rachel], did you form any opinions?
...
MS. KIRK: My opinion was that her disclosure was consistent with child sexual abuse.
PROSECUTOR: Okay. And can you, please, describe for the jurors in as much detail as you can, the basis for that opinion. What things did you note and what was significant to you based upon your training, your education and your experience.
MS. KIRK: So what I noticed in her disclosure in the interview that helped form[ ] that opinion was the detail of her disclosure that she made-well, I guess, first [she] made a very clear disclosure of acts and sexual abuse occurring to her and multiple acts.
And that when she disclosed these acts of sexual abuse, she provided a lot of different types of details in her disclosure that supported that this was something she had actually experienced. And the details included contextual details, talking about where she was, her surroundings, what was occurring before and after and during the incident or incidents.
And that she provided sensory details, that what she physically felt, saw and heard while these different incidents of sexual abuse were occurring. She talked about her thoughts and feelings while it was happening, crying or feeling sad, for example, during these incidents.
She also-there was also what I refer to as internal and external consistency in her disclosure at different points. So when she would talk about an incident some of the incidents that she talked about with more details there would be one example I can think of is that Mr. Barbour removed his clothing and then she talked about what happened at the end. She said he put his clothing back on. So that's an example of internal consistency.
And external consistency being that some of what she told me in the interview matched with what she had previously told the social worker, Ms. Doyle, that had referred her.... And she used developmentally appropriate language, vocabulary to describe what occurred to her. So these are some of the different things that I heard or noticed during the interview that helped me form my opinion that it was consistent with child sexual abuse. She also was able to distinguish in terms of the context where the different incidents occurred and talk with clarity about who had done what.
DEFENSE COUNSEL: Objection, move to strike.
THE COURT: Overruled.
Defendant directs our attention to State v. Frady , 228 N.C. App. 682, 747 S.E.2d 164 (2013), in which this Court held that testimony similar to Ms. Kirk's was an inadmissible opinion on the child's credibility. In Frady , a medical doctor testified on behalf of the State that the six-year-old child's "disclosure is consistent with sexual abuse." The doctor testified that her opinion was based upon the "consistency of her statements over time, the fact that she could give sensory details of the event ... [and] her knowledge of the sexual act that is beyond her developmental level." Frady , 228 N.C. App. at 684, 747 S.E.2d at 166. In our opinion in Frady , this Court noted that there was no physical evidence of sexual abuse, and that the doctor had not examined or interviewed the child and had not testified about the characteristics of sexually abused children. On these facts, Frady held that "[w]hile Dr. Brown did not diagnose Debbie as having been sexually abused, she essentially expressed her opinion that Debbie is credible. We see no appreciable difference between this statement and a statement that Debbie is believable." Frady at 685-86, 747 S.E.2d at 167.
We agree with defendant that our opinion in Frady provides support for his argument that Ms. Kirk's testimony was inadmissible. We also note that this Court has previously held, in a case in which an expert witness testified that "[i]n all of [her] training and experience, when children provide those types of specific details it enhances their credibility[,]" that this "statement was 'an impermissible opinion regarding the victim's credibility.' " State v. Horton , 200 N.C. App. 74, 78, 682 S.E.2d 754, 757 (2009) (quoting Stancil , 355 N.C. at 266-67, 559 S.E.2d at 789 ). We do not interpret Frady or Horton as establishing a bright-line rule that testimony by an expert that the statements of a witness were consistent with a history of sexual abuse is never admissible, regardless of the factual context. However, for several reasons, we conclude that Ms. Kirk's testimony that Rachel's statements were "consistent with sexual abuse" was not an admissible expert opinion.
We first note that Ms. Kirk's repeated use of the word "disclosure," as opposed to a more neutral term such as "statement," carries with it an implication that there was, in fact, something to "disclose." Secondly, Ms. Kirk's testimony that there were a "lot of different types of details in her disclosure that supported that this was something she had actually experienced" (emphasis added), was a statement that explicitly vouched for Rachel's credibility.
More importantly, we have a general concern about the degree, if any, to which Ms. Kirk's testimony was based upon her expertise. Ms. Kirk essentially testified that Rachel's statements were "consistent with sexual abuse" because (1) Rachel provided a detailed description of incidents of abuse, including sensory details, (2) Rachel's statements to Ms. Kirk were consistent with what she told others and remained consistent over time, and (3) Rachel used age-appropriate language.
We do not dispute that, in assessing a witness's credibility, it is appropriate to consider the level of detail in the witness's statements, the consistency of the statements, and whether the statement was couched in language that was consistent with the witness's general vocabulary. The probative value of these factors is the very reason that prior consistent and inconsistent statements are admissible to corroborate or impeach a witness's trial testimony. As a result, it was reasonable for Ms. Kirk to consider the indicia discussed above as being "consistent with" Rachel's truthfulness.
However, the basis of this opinion was common sense, rather than her expertise. The consistency between the fact that a person experienced something and the person's ability to describe it in detail applies to any experience, not just to sexual abuse. Thus, if a person discusses a foreign city in great detail, including recollection of the sounds and smells, this is "consistent with" the person having taken a vacation there. If a witness provides detailed and consistent statements to law enforcement officers about an armed robbery, this is "consistent with" the fact that the witness was present during the crime. In this case, Ms. Kirk did not testify that the content of Rachel's statements was consistent with sexual abuse. For example, Rachel did not describe physical features of defendant's person that could only be seen when he was undressed. Nor did Ms. Kirk testify that specific aspects of Rachel's statements might escape the notice of a layperson but were known to her to have significance, based upon her expertise and training. Rather than the content of Rachel's statements, it was the mere fact that her statements were detailed, age-appropriate, and consistent over time that led Ms. Kirk to opine that Rachel's statements were consistent with sexual abuse. We conclude that Ms. Kirk was in no better position than the jurors to reach this conclusion and that, as a result, it was not an admissible expert opinion and that on the facts of this case, it was error to admit Ms. Kirk's testimony that Rachel's statements were consistent with sexual abuse.
We next consider whether defendant was prejudiced by the admission of this testimony. N.C. Gen. Stat. § 15A-1443(a) provides that a defendant is prejudiced by non-constitutional errors "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant." N.C. Gen. Stat. § 15A-1443(a) (2016). Defendant correctly notes that credibility was a central issue in this trial, particularly the relative credibility of defendant and of Rachel. The trial court instructed the jury as follows regarding its determination of the credibility of the witnesses:
You are the sole judges of the believability of witnesses. You must decide for yourselves whether to believe the testimony of any witness. You may believe all, any part or none of a witness' testimony. In deciding whether to believe a witness, you should use the same tests of truthfulness that you use in your everyday lives. Among other things these tests may include the opportunity of the witness to see, hear, know or remember the facts or occurrences about which the witness testified; the manner and appearance of the witness; any interest, bias, prejudice, or impartiality the witness may have ... the apparent understanding and fairness of the witness, whether the testimony is reasonable and whether the testimony is consistent with other believable evidence in the case.
In this case, the jury had a number of sources from which to assess both Rachel's and defendant's credibility and to "use the same tests of truthfulness" that the jurors use in their everyday lives. Both defendant and Rachel testified at trial, which allowed the jury to observe their demeanor and to evaluate their "apparent understanding and fairness," as well as whether their testimony was "reasonable and ... consistent with other believable evidence in the case."
Supporting testimony was also introduced that was pertinent to the jury's credibility determinations. The jury was shown a recording of Rachel's interview by Ms. Kirk, providing another opportunity for the jury to observe Rachel's demeanor, and to judge the consistency of her statements. In addition, several other witnesses testified about Rachel's statements and her behavior. With regard to defendant, one of the State's witnesses, Ms. Pero, testified in detail about her conversation with defendant at his trailer, including defendant's statements concerning his interactions with Rachel. Defendant testified after the State had rested its case, and thus had the opportunity to explain or clarify some of the State's evidence. Defendant also offered the testimony of Ms. Peedin, who testified both that defendant had a reputation for honesty and that his behavior around her children had not caused her concern.
Here, the jury had multiple sources from which to assess the credibility of both defendant and Rachel, including their testimony in court. In this factual context, it is unlikely that Ms. Kirk's testimony that Rachel's statements were consistent with sexual abuse, played a significant role in the jury's decision to return verdicts finding defendant guilty of the charged offenses. As a result, we conclude that defendant is not entitled to a new trial on the basis of this error.
Defendant has also challenged the testimony of Ms. Drake that "what [Rachel] exhibited and her descriptions" were "consistent with other children [Ms. Drake had] seen who have been known to have been sexually abused." Defendant contends on appeal that Ms. Drake's opinion "was nothing more than her opinion that Rachel's statements were true." We do not agree.
In his appellate brief, defendant acknowledges that Ms. Drake described a number of behaviors or symptoms that Rachel exhibited, including the facts that Rachel was "not sleeping, she was fearful, she had clinging behavior, she had physical complaints, she had intrusive thoughts and flashbacks." Defendant does not contend that it was improper for Ms. Drake to testify about Rachel's behavior, symptoms, or the degree of detail in Rachel's interviews with Ms. Drake. We conclude that Ms. Drake's testimony falls with the permissible scope of expert testimony that a child's behavior and statements are consistent with the characteristics of children who are known to have been sexually abused. This argument lacks merit.
Prosecutor's Closing Argument
Defendant argues next that the trial court erred by failing to intervene ex mero motu during the prosecutor's closing argument. Defendant asserts that the prosecutor's arguments "improperly told the jury that the State's experts had determined that Rachel was a sexually abused child and that she told the truth when she said that [defendant] was one of her abusers." Upon careful review of the closing arguments by defense counsel and the prosecutor, we conclude that defendant is not entitled to relief on the basis of this argument.
The statutory limits on closing arguments of counsel are set out in N.C. Gen. Stat. § 15A-1230(a) (2016), which provides in relevant part that "[d]uring a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record[.]" Our Supreme Court recently noted that "[i]n an attempt to strike a balance between allowing attorneys appropriate latitude to argue heated cases and enforcing proper boundaries to maintain professionalism, this Court has considered prosecutors' closing arguments at length." State v. Huey , --- N.C. ----, ----, 804 S.E.2d 464, 469 (2017). Huey quoted the standard for appellate review of whether a trial court erred by failing to intervene during a closing argument to which counsel did not object:
The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene ex mero motu . In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord.... Thus, when defense counsel fails to object to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial.
Id . (quoting State v. Jones , 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) ).
In this case, defense counsel's closing argument was primarily focused on undermining the credibility of the State's witnesses, by repeatedly attacking their integrity and objectivity. Defense counsel argued generally that the State's witnesses were "advocates" who were so intent upon finding evidence of sexual abuse that they had "tunnel vision" and might perceive innocent interactions between children and adults as evidence of criminal behavior. Defense counsel also made specific arguments challenging the credibility of individual witnesses. For example, defense counsel made the following statements during his closing argument:
You know, the danger, ... [is] confirmation bias. You may have heard of it. You are looking for something and everything starts to look like something that supports that theory. Some people call it tunnel vision. You know, I've heard it said if you are holding a hammer, everything you see looks like a nail. That's the problem with some of the testimony in this case is that people who look for sex abuse start to think that they see it everywhere.
Start with Dr. [Witman].... No abnormal physical findings at all. Lord knows if there were any, she would have noted them because she very much wanted to find them.... Maybe a negative physical exam doesn't mean it didn't happen. But she wants to go further than that and say, well, that's consistent with child sexual abuse. You know, as if a negative exam, the absence of evidence somehow makes it more likely that it occurred. She said it's consistent with child sexual abuse.... [I]f she finds physical evidence, she, of course, would say it's consistent with sexual abuse. If she finds nothing, she also says that's consistent with sexual abuse. That's somebody who's holding a hammer. That's somebody who finds it no matter what she sees, and, of course, remember, she works at an advocacy center. She's an advocate.
...
Look at her colleague, Ms. Kirk. Ms. Kirk also very much wants to say it's consistent with sexual abuse. She's actually purported to give some reasons based on the interview what she says are some reasons. But remember underneath it all it's all what [Rachel] told her. What are the reasons she cites? ... Details. She said, well, these were detailed disclosures because she talked about places[.] ... There's nothing about the fact she came up with details about that that makes any difference.... [Ms. Kirk] knew about Gordon Parish.... No followup whatsoever. Why not? Because that didn't fit what they were looking for at the time....
It brings us to [Rachel].... She clearly has limitations, mental illnesses.... She has some serious mental health diagnoses. Bipolar, pretty serious.... Oppositional defiant disorder. Even Ms. Drake characterized vindictiveness, desire for revenge, spite against those in authority[.] ... So when you consider what she says, you have to consider her mental issues. Ask yourself when she talks about [defendant], is it truth, is it fiction, is it conflation, is it confusion. You saw her testify. We've come to that finally. At times a little bit of a strange affect. A singsong affect.... At some point it's clear she's confused[.]
...
That brings you back to the crazy world of child sexual abuse, of allegations of child sexual abuse where everything they see is tunnel vision because they are all holding hammers.... [T]hey are so immersed in that world that that's all they see[.] ... Now, they're such advocates that they wanted to talk at times about her remarkable memory[.] ... That tends to ignore the objective testing ... [that] revealed that [Rachel] has a low working memory. Only 76 IQ, eligible for an IEP.... Did anybody molest her? Do we know? Is she confused? Is she conflating? Is she lying? It's impossible to say....
They are looking through tunnel vision at what's happening. What if they applied that standard to the rest of us in our own lives? Anybody who's a caretaker of a child, you play games together? ... You drew the bath and told her to get in the bathtub. All the things that are normal parts of everyday life in caring for a child they wanted to treat in a sinister manner.
[The State's witnesses were] [n]ot interested in talking with [Ms. Peedin], who knows him. [They were] [m]ore interested in judging him on the word of a bipolar, confused, oppositionally defiant, lies to get what she wants 12 year old who claims to have been molested by at least three men.
...
You don't have to decide if [Rachel is] lying or if she's confused or if she's conflated or this is a delusion brought about by her mental illness. You don't have to decide any of those things. You just have to know enough that you don't know for sure. Ultimately, this case rests on the inconsistent, conflated story of a little girl ... who will lie to get what she wants.... If that's enough to convict somebody, then nobody in this courtroom is safe.
Thus, in his closing argument, defense counsel characterized Rachel as a mentally ill, deceitful, and unreliable witness, and argued that the State's expert witnesses "wanted to find" sexual abuse and were so "immersed" in the "crazy world" of sexual abuse that they had "tunnel vision" and were "advocates" who did not look at evidence objectively. In the prosecutor's closing argument, he discussed the evidence and argued that the reality of child sexual abuse was different from its portrayal in the media. He also responded to defense counsel's argument, and argued to the jury that the State's witnesses were trained professionals, whose opinions were based upon their training and experience, rather than upon bias:
MR. JACKSON: [T]he tunnel vision that we need to be concerned about is the tunnel vision that [defense counsel] just got up here and asked you to do....
Every ... professional that came into [Rachel's] life, people who know what sex abuse really looks like who deal with it every day, who knows what it doesn't look like also, who can discern what is and what isn't, they fulfilled their responsibility.... [Defense counsel] wants you to believe, hey, you can't believe any of these professionals because they've got tunnel vision. They don't have tunnel vision, they've got education. They've got experience.... [Y]ears of experience dealing with and discerning what is child abuse and what is not child abuse and what to look for....
...
So the professionals come in who are trained to recognize when a child is lying and when a child is telling the truth[.] ... How do they put it together? ... [T]hey know what to look for, and it was there every time and it's there for you to see.... You've got to think [about] it critically. That's why you can't decide this case from your gut. You've got to ... apply your reason and common sense and your intellect because she's telling the truth....
...
Remember who admitted to spreading her legs open? Now, I'm not asking you to believe that this rubbing of the vagina with diaper cream is real. It is just the defendant's attempt when he was confronted to explain his sexual abuse. That's not the truth. That's not the truth. He knows that. That's his attempt to explain it away, and when he does try to explain it away, what is he saying? You know he says, oh, I asked her permission, as if that makes it okay.... He said he smelled her vagina, he put her up on the toilet and spread her legs, described an angry vagina and then began to rub ointment on her after he had just met them. I contend to you he was sexually abusing her and he was trying to explain away what [Rachel] was disclosing. That's why he said that. No man does that. No baby-sitter.... (Resume video.) ... Do you really think that a child's going to be able to make that up? She's describing details who abused her, where, when, and then what happens after. She has a low IQ. She is not able to make this stuff up. She is not that smart.... There's no way that this child is making that up against this defendant. That is a sexual experience she experienced in his house. Lot 59. The cats meowing. She also describes the smell of the cats. That's how you know it's real. That's why you've got to look at it critically.... There could be no doubt she's telling the truth about this defendant....
...
The other thing [the defendant] can do is they can put witnesses on for [Rachel's] reputation for untruthfulness, but there are none because she's truthful. There are no witnesses. You did not hear the defendant say ... [that Rachel] lies, she lies all the time, she lies to get her way. No.... Where is that evidence? Because it doesn't exist. Because she's not anything but honest and truthful with you and everybody else that she's talked with.
As discussed above, in closing argument an attorney may not "inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant[.]" Upon review of the closing arguments of both defense counsel and the prosecutor, it appears that both attorneys skated close to the edge, and occasionally over the edge, of this rule.
Defense counsel argued that Rachel "lies to get what she wants" and that she had falsely accused defendant in order to be removed from her mother's care. Defense counsel also argued that the State's expert witnesses were "advocates" who "wanted to find" evidence of sexual abuse because they had "tunnel vision" and were unwilling or unable to view the evidence objectively. We conclude that defendant's closing argument was focused upon challenging Rachel's credibility and the integrity, objectivity, and credibility of the State's witnesses.
In response, the prosecutor argued that the opinions offered by the State's witnesses were based upon their extensive experience and training, rather than being the result of a determination to find evidence of sexual abuse regardless of the facts. For the most part, the prosecutor's arguments were an appropriate response to defense counsel's attack on the credibility of the State's witnesses, and were based upon the prosecutor's references to specific evidence. However, on more than one occasion, the prosecutor crossed the line set out in N.C. Gen. Stat. § 15A-1230(a). For example, the prosecutor stated that defendant's explanation of applying ointment to Rachel's genitals was "not the truth" and that "defendant knows that." The prosecutor also argued several times that Rachel was truthful, or was telling the truth. In these instances, however, the prosecutor's statements were generally associated with the record evidence. For example, the prosecutor's statement that defendant was not truthful about treating Rachel for an alleged yeast infection was part of an argument that this testimony was not consistent with everyday experience, in that "[n]o babysitter does that" and that defendant had failed to produce any medical evidence that Rachel had an infection. Similarly, the prosecutor's statements that Rachel was honest or truthful were made as part of more general arguments that, for example, Rachel was not intelligent enough to fabricate a detailed story, or that defendant had failed to produce witnesses who would testify that she was untruthful.
We conclude that both the prosecutor and defense counsel made statements during their respective closing arguments that tended to express a personal opinion as to the honesty or credibility of the witnesses. Most of the prosecutor's arguments were within permissible bounds, and to the extent that the prosecutor improperly argued about the honesty of the witnesses, we conclude that these arguments were not so egregious as to require the court to intervene ex mero motu nor did they deprive defendant of a fair trial. As a result, we hold that defendant is not entitled to relief on the basis of this argument.
Cross-examination of State's Witnesses
Defendant's final argument is that the trial court erred by not allowing him to cross-examine witnesses about Rachel's allegations that she had been abused by a man identified as "Miguel." Defendant contends that the court's ruling violated his "constitutional right to confront and cross-examine the State's witnesses[.]" We conclude that this argument lacks merit.
At trial defendant "sought and obtained a ruling by the trial court on the admissibility under Rule 412 of [Rachel's] allegations that she had been sexually abused by Miguel." N.C. Gen. Stat. § 8C-1, Rule 412 (2016) provides that:
(a) As used in this rule, the term "sexual behavior" means sexual activity of the complainant other than the sexual act which is at issue in the indictment on trial.
(b) Notwithstanding any other provision of law, the sexual behavior of the complainant is irrelevant to any issue in the prosecution unless such behavior:
(1) Was between the complainant and the defendant; or
(2) Is evidence of specific instances of sexual behavior offered for the purpose of showing that the act or acts charged were not committed by the defendant; or
(3) Is evidence of a pattern of sexual behavior so distinctive and so closely resembling the defendant's version of the alleged encounter with the complainant as to tend to prove that such complainant consented to the act or acts charged or behaved in such a manner as to lead the defendant reasonably to believe that the complainant consented; or
(4) Is evidence of sexual behavior offered as the basis of expert psychological or psychiatric opinion that the complainant fantasized or invented the act or acts charged.
On appeal, defendant does not identify any provision of Rule 412 that would apply to Rachel's statements that when she was around five years old she had been sexually abused by Miguel. We conclude that defendant's proposed cross-examination does not fall within any of the exceptions in Rule 412(b).
Defendant also asserts that the trial court's ruling deprived him of his constitutional right to cross-examine Rachel and Ms. Kirk. "The Sixth Amendment of the Constitution, made applicable to state criminal proceedings by Pointer v. Texas , 380 U.S. 400, 85 S. Ct. 1065, 13 L.Ed. 2d 923 (1965), guarantees the right of an accused in a criminal trial to be confronted with the witnesses against him." State v. Fortney , 301 N.C. 31, 36, 269 S.E.2d 110, 112-13 (1980). However, "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Fortney , 301 N.C. at 36, 269 S.E.2d at 113. In Fortney , our Supreme Court explained:
Thus, while a defendant may generally cross-examine to impugn the credibility of a witness, this right is not inviolate. Indeed the Supreme Court has expressly stated that a court has a duty to protect a witness "from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him." Implicit in this statement is the recognition that in such cross-examination, the probative value of any admission is outweighed by its prejudicial effect. The question of the proper scope of cross-examination, therefore, involves resolving the "tension between the right of confrontation and the State's policy of protecting the witness...."
Fortney at 36, 269 S.E.2d at 113 (quoting Alford v. United States , 282 U.S. 687, 694, 75 L.Ed. 624, 629 (1931), and Davis v. Alaska , 415 U.S. 308, 314, 39 L.Ed. 2d 347, 352 (1974) ). The trial court's authority to resolve this tension is expressly recognized in N.C. Gen. Stat. § 8C-1, Rule 403 (2016), which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
"A trial court's decision to exclude evidence under Rule 403 is reviewable by this Court for an abuse of discretion." State v. Huggins , 338 N.C. 494, 500, 450 S.E.2d 479, 483 (1994). "The trial court may be reversed for an abuse of discretion 'only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision.' " State v. Blakeney , 352 N.C. 287, 298, 531 S.E.2d 799, 809 (2000) (quoting State v. Allen , 322 N.C. 176, 189, 367 S.E.2d 626, 633 (1988) ). In addition, this Court has held that when a trial court conducts a voir dire of the witness to determine the substance of the proffered testimony, and considers arguments from both sides before ruling on the admissibility of the testimony, the trial court does not err by failing to explicitly conduct a Rule 403 balancing test on the record. State v. Washington , 141 N.C. App. 354, 367, 540 S.E.2d 388, 427 (2000), disc. review denied , 353 N.C. 396, 547 S.E.2d 427 (2001).
Defendant argues that Rachel's statements concerning Miguel were "inconsistent." The only inconsistency identified by defendant is that Rachel told Ms. Kirk that she had been abused by two men, defendant and Mr. Hauber, but later told Ms. Drake that she had also been abused by Miguel. Defendant's primary argument is that he was entitled to impeach Rachel's credibility on the basis of her decision to tell Ms. Drake, but not Ms. Kirk, about Miguel. It is undisputed that Rachel met Ms. Kirk only once, when she was interviewed at SAFEchild, but that Ms. Drake provided Rachel with counseling therapy for many months. Defendant has not explained how it is "inconsistent" for a child to share more in the context of ongoing therapy than in a single interview. Moreover, defendant was able to cross-examine Rachel and the State's expert witnesses about other inconsistencies in their testimony. For example, defense counsel cross-examined Rachel about her apparent confusion as to whether it was defendant or Mr. Hauber, or both, who had told her that she would be a "good stripper." Assuming, arguendo , that Rachel's allegations against Miguel, about whom no information was elicited at trial or on voir dire , had any relevance to this trial, we conclude that the trial court's exclusion of defendant's cross-examination on this issue was neither an abuse of discretion nor a violation of his Sixth Amendment right to confront and cross-examine witnesses.
Conclusion
For the reasons discussed above, we conclude that it was error to allow Ms. Kirk to testify that Rachel's statements were "consistent with child sexual abuse" where this opinion was not based upon her expertise, but that this error was not prejudicial. We further conclude that the trial court did not err by admitting Ms. Drake's testimony, by failing to intervene ex mero motu during the prosecutor's closing argument, or by excluding defendant's proposed cross-examination of Ms. Kirk and Rachel about Rachel's allegations that she was abused by a third man, Miguel. We conclude that defendant had a fair trial, free of reversible error.
NO PREJUDICIAL ERROR IN PART, NO ERROR IN PART.
Report per Rule 30(e).
Judges STROUD and ARROWOOD concur.

For ease of reading and to protect her privacy, in this opinion we refer to the alleged victim as Rachel, which is the pseudonym used by the parties.

State v. Martinez , 212 N.C. App. 661, 711 S.E.2d 787 (2011) ; State v. Horton , 200 N.C. App. 74, 682 S.E.2d 754 (2009) ; State v. Towe , 366 N.C. 56, 732 S.E.2d 564 (2012) ; State v. Grover , 142 N.C. App. 411, 543 S.E.2d 179 (2001) ; State v. Bush , 164 N.C. App. 254, 596 S.E.2d 715 (2004); and State v. Ewell , 168 N.C. App. 98, 606 S.E.2d 914 (2005), respectively.