IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1150

Filed: 4 August 2020

Hoke County, No. 17 CRS 51607-09, 17 CRS 575

STATE OF NORTH CAROLINA

v.

ALLEN MAURICE MORRISON

Appeal by Defendant from judgment and order entered 5 June 2017 by Judge Mary Ann Tally in Superior Court, Hoke County. Heard in the Court of Appeals 26 May 2020.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Patrick S. Wooten, for the State.*

*Carella Legal Services, PLLC, by John F. Carella, for Defendant.*

McGEE, Chief Judge.

Allen Maurice Morrison ("Defendant") appeals from judgment entered 5 June 2019 after a jury found him guilty on one count of possession of a firearm by a felon, three counts of assault with a deadly weapon, and seven out of eight counts of discharging a firearm into an occupied vehicle ("DWOV"). Defendant argues the trial court erred by: (1) admitting a lay witness' testimony when expert testimony was required; (2) violating his right to be free from double jeopardy under the United States and North Carolina Constitutions by sentencing him on multiple counts of

DWOV; and (3) denying his motion to dismiss six of the seven counts of DWOV for which he was convicted. We find no error on appeal.

## I. Factual and Procedural History

Gwendolyn Blue ("Ms. Blue") was Defendant's live-in girlfriend at his home in Raeford, North Carolina (the "house") on the evening of 13 January 2017. Jessica Oldham ("Ms. Oldham," together with Ms. Blue "the women") was visiting the house for the first time that evening, having just met Ms. Blue and having never met Defendant. Both the women testified that shortly after they arrived at the house, Ms. Blue and Defendant got into an argument and Defendant hit Ms. Blue in the face. Later, Ms. Oldham gave Defendant $200.00 "for him to make more money with[,]" presumably through some kind of drug transaction. However, the "money-making" event never occurred. Defendant and Ms. Blue eventually "laid down and took a nap" in Defendant's bedroom. Ms. Oldham also fell asleep in the house.

When Ms. Oldham awoke at approximately 2:00 a.m. on 14 January 2017, she went into Defendant's bedroom to ask Defendant to return her $200.00 so she could go home. Ms. Oldham testified that she gently woke Defendant to request the return of her money. Ms. Blue testified that, Defendant "got angry and jumped up and kicked [Ms. Oldham] in the stomach" so hard that she "flew through the door[,]" then Defendant "threw some money at" Ms. Oldham. Ms. Oldham testified that Defendant "kicked me dead in my stomach harder than I've ever been kicked in my life[,]"

sending her through the bedroom door and into the kitchen, where it took her awhile to catch her breath. Ms. Oldham testified that she told Defendant she just wanted her money so she could leave, and Defendant threw a rolled up wad of bills at her, hitting her in the face. Ms. Oldham left the house, joined by Ms. Blue, who had decided she also wanted to get away from Defendant. The women left on foot, since neither of them had a vehicle at the house.

The women were walking toward Highway 211, not yet far from the house, when they saw Defendant had come out onto the front porch of the house. Ms. Oldham testified she told Ms. Blue: "'He's got a gun.' [So w]e took off running. He started shooting at us." Both women testified they saw Defendant standing on the porch of the house, holding a firearm and shooting it in their direction. Ms. Blue testified that the gun she saw Defendant shooting at her was a black "assault rifle," which she had seen Defendant shoot before. Ms. Oldham could not describe the gun other than suggesting it was not a handgun she had seen earlier that day in Defendant's Range Rover (the "Range Rover"). The women ran into nearby woods for cover, then continued to run toward Highway 211, which was nearby. Ms. Oldham testified that she heard "at least ten" bullets fired, hitting the trees as she "[ran] in a zigzag through the trees." The women reached Highway 211, screaming, waving their arms, and sometimes standing in the lane of oncoming traffic in an attempt to get help, but a number of vehicles drove around and past them.

Retired veteran Leslie A. Mortenson ("Mr. Mortenson"), a UPS contractor, was driving west on Highway 211 at approximately 2:00 a.m. on 14 January 2017, heading to his home in Raeford from a repair job in South Carolina.[1] As Mr. Mortenson was driving just west of central Raeford on Highway 211, he "c[a]me across two young ladies in the highway waving frantically for [him] to stop"—these two women were Ms. Oldham and Ms. Blue. Mr. Mortenson stopped his Ford Ranger pick-up truck (the "truck") in the middle of the road and rolled down his front passenger window to talk to the women. The women told Mr. Mortenson that "someone was after them, was trying to hurt them," and when he asked who was "after them," "they told [him] the name of that person," was "Allen Morrison"—Defendant. Mr. Mortenson testified "at that time, I was sitting in the middle of the highway, so I pulled over onto the shoulder. [The women] started screaming frantically at that time that [Defendant] was . . . coming from Highway 211 behind me, [ ] then he pulled in front of me, blocking my exit." Ms. Oldham testified: "I could see the headlights of [Defendant's] Range Rover coming. So I was like, 'I think that's him,' you know. And I was just in a panic, basically."

Mr. Mortenson testified the Range Rover "pulled diagonally in front of me, so [Defendant's] passenger-door area of his vehicle[ ] was ['just a few feet' from the] front

---

[1] In the State's brief, it describes Mr. Mortenson as a "retired Special Forces veteran with twenty-six years and ten months military service," but we cannot find record evidence supporting this description of Mr. Mortenson as having been a member of "Special Forces."

of my vehicle." Mr. Mortenson lowered his front driver's side window and stated that Defendant's "passenger window was down. The two [women] were standing behind my passenger door. There was words being said back and forth[, '[a] lot of profanity']." Ms. Oldham testified she told Mr. Mortenson, about Defendant, "[h]e's got a gun." Mr. Mortenson, a veteran, retrieved a .357 revolver from under his seat and "had it in [his] hand, ready – ready to return fire if fired upon." Ms. Oldham told Mr. Mortenson: "'We're just trying to get away. [Defendant's] shooting at us,' you know, just kind of in a panic." Mr. Mortenson testified he heard Defendant say to the women: "You better get you[r] a---s in my vehicle. This s---'s fixing to get real."

Mr. Mortenson testified that Defendant was the only person in the Range Rover, and that he could clearly see Defendant's face as Defendant leaned over so that his face was visible through the open front passenger side window. "Then there was a rifle stuck out the passenger window of [the Range Rover], towards the [women]." Mr. Mortenson stated: "I could tell, because I was so close to it, that it was a smaller-caliber rifle, because I could see the tip of the barrel." Once Mr. Mortenson saw Defendant's rifle, he got "ready to return fire if fired upon" by "center[ing his left hand, holding the revolver,] on the mirror of my vehicle on the driver's door." Mr. Mortenson stated: "I was not worried about being shot, because the way the [Range Rover] was sitting and the door pillar of [the Range Rover], [Defendant] could not get the rifle pointed back towards me. But he did have a clear shot at the [women]."

Defendant continued screaming at and ordering the women to get into the Range Rover, mostly arguing with Ms. Blue, but the women refused to give up the relative security of their positions behind the open front passenger door of the truck and go with Defendant. Mr. Mortenson stated that one of the women "screamed at [Defendant] that I [also] had a weapon." Defendant then moved the Range Rover from its position perpendicular to the front of the truck and repositioned it perpendicular to the rear of the truck, approximately five to seven feet from the tailgate of the truck, thereby providing Defendant more freedom to fire the rifle out of the open front driver's side window, and putting the women as well as Mr. Mortenson in Defendant's line of fire. Defendant's maneuver also severely limited Mr. Mortenson's ability to aim his revolver at Defendant. According to Mr. Mortenson: "That's when [Defendant] started shooting, and I floored the vehicle to exit the location, with one of the [women] still protruding from the vehicle." As Defendant was firing the rifle, "the [women] jumped in [the truck], because . . . at that point, that was their only protection."

Defendant continued to fire at the truck as it drove away, but Defendant did not chase the truck. Mr. Mortenson testified at trial that he heard approximately seven shots. Based on his prior experience with firearms in the military, Mr. Mortenson determined "they were individual shots but at a fairly rapid pace. [T]hey weren't as rapid as an automatic weapon[,]" and he further testified that Defendant

was firing shots at them both before he pulled away, and after he sped away westbound on Highway 211. Ms. Oldham testified to hearing bullets hit the back of the truck as they drove away. Defendant made a hard turn through a ditch and drove off heading east on Highway 211, back in the direction of the house.

Mr. Mortenson drove the two women west on Highway 211 to a nearby convenience store where he parked and called 911. Sargent Sanchez ("Sargent Sanchez") and Detective Carlos Castaneda ("Detective Castaneda" and, with Sargent Sanchez, the "officers") of the Hoke County Sheriff's Office arrived at the convenience store within approximately "fifteen to twenty minutes."[2] The officers took statements from the women, then allowed them to leave with a friend. The officers also interviewed Mr. Mortenson, examined the back of the truck, and took photographs of "six impacts . . . where projectiles had hit the tailgate of the vehicle."

Mr. Mortenson also led the officers to the scene of the shooting where officers collected a discharged .22 caliber projectile from the road, and documented six .22 caliber shell casings, which they later collected. The officers then followed Mr. Mortenson home so that he could dismantle the tailgate of the truck. The officers recovered two projectiles from the tailgate of the truck, which Detective Castaneda identified as having "come from a .22-caliber rifle." On 17 January 2017, Mr. Mortenson called the Sheriff's Department to report that he had located two more

---

[2] The first name of Sergeant Sanchez does not appear in the record on appeal.

bullet holes in the truck. Detective Castaneda returned to the scene of the shooting that afternoon and recovered an additional four spent .22 caliber shell casings, raising the total number of .22 caliber shell casings found at the site to ten.

Defendant moved for dismissal at the close of the State's evidence, which the trial court denied. Defendant presented no evidence at trial and, on 5 June 2019, the jury found Defendant guilty on seven of the eight counts of DWOV. Defendant was sentenced to active consecutive sentences of fifty-nine to eighty-three months for the first count of DWOV, fifty-nine to eighty-three months for the second DWOV count, and an additional fifty-nine to eighty-three months for the remaining five counts, which the trial court consolidated. Defendant was also given an active sentence of twelve to twenty-four months for possession of a firearm by a felon, to run consecutive to the DWOV judgments, but the trial court arrested judgment on the three counts of assault, finding they were "subsumed by the factual basis for the charge[s] of discharging a weapon into an occupied vehicle." Defendant appeals.

## II. Analysis

### A. *Admission of Lay Witness Testimony*

Defendant argues: "The Trial Court Committed Plain Error by Admitting the Testimony of a Lay Witness that, Based Solely on its Sound, a Firearm that was Never Recovered was Semi-Automatic Rather than Automatic." We disagree.

Specifically, Defendant contends that Mr. Mortenson's testimony concerning the rapidity of the rifle shots as Defendant was shooting into the fleeing truck constituted expert testimony and, thus, should have only been given by an expert qualified under N.C. Gen. Stat. § 8C-1, Rule 702. Although Defendant failed to object to the testimony at trial, Defendant contends on appeal that admission of the now-challenged testimony constituted plain error and warrants a new trial.

1. Standard of Review

"[A] prerequisite to our engaging in a 'plain error' analysis is the determination that the [trial court's action] constitute[d] 'error' at all." *State v. Fisher*, 171 N.C. App. 201, 212–13, 614 S.E.2d 428, 436 (2005) (citation omitted). Because we find no error, we also find no plain error.

We review the trial court's decision to admit lay testimony for abuse of discretion. *State v. Hill*, 247 N.C. App. 342, 346, 785 S.E.2d 178, 181 (2016) (citing *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000)). "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. Gen. Stat. § 8C–1, Rule 602 (2019). Lay witness testimony is governed by N.C. Gen. Stat. § 8C-1, Rule 701:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2019).

When a lay witness presents testimony based on opinion or inference, "a foundation must first be laid that the testimony is rationally based on the lay witness's perception." *State v. Mitchell*, __ N.C. App. __, 840 S.E.2d 276, 283 (N.C. Ct. App. 2020) (citation omitted); *see also State v. Givens*, 95 N.C. App. 72, 79, 381 S.E.2d 869, 873 (1989) (finding an officer's testimony about drug paraphernalia violated Rule 701 because the State failed to show the officer had "a basis of personal knowledge for his opinion."). However, this Court has repeatedly held that the ability of a witness to accurately assess the facts of a situation "is a question of credibility rather than a question of admissibility." *State v. Green*, 77 N.C. App. 429, 431, 335 S.E.2d 176, 177 (1985) (citation omitted) ("As long as the time and distance of the observation enable the witness to do more than hazard a guess, the testimony is admissible."); *see also State v. Norman*, 213 N.C. App. 114, 119, 711 S.E.2d 849, 854 (2011) (citations omitted) ("The conditions under which the witness observed the person, and the opportunity to observe him, go to the weight, not the admissibility, of the testimony."). There is no doubt that Mr. Mortenson's testimony concerning the speed with which Defendant fired the rifle was "helpful to . . . the determination of a fact in issue." N.C.G.S. § 8C-1, Rule 701(b). We therefore focus on N.C.G.S. § 8C-1, Rule 701(a).

2. Testimony Rationally Based on the Perception of the Witness

Because Mr. Mortenson was driving the truck that was hit by multiple .22 caliber projectiles, fired by Defendant, the State established Mr. Mortenson's first-hand knowledge of the shooting incident. Although the State could have been more thorough in laying the foundation for Mr. Mortenson's testimony differentiating between the sound of, and spacing between, automatic and semi-automatic rifle fire, the foundation laid was sufficient to support the testimony. Because Mr. Mortenson's testimony was properly admitted, there was no reason for the trial court to exclude it *sua sponte*. We find no error.

We also note that, had Defendant objected to the testimony, the State would have had the opportunity to further develop the foundation for this testimony at trial. Concerning the shots fired by Defendant, the following colloquy occurred between the State and Mr. Mortenson:

> Q. Can you describe the pace at which those shots—that you heard those shots?
>
> A. They were—they were individual shots but at a fairly rapid pace. It—they weren't as rapid as an automatic weapon.
>
> Q. Are you familiar with automatic-weapon fire from your time in the military?
>
> A. Yes, sir.
>
> Q. So you've heard that before?
>
> A. Yes, sir.

- 11 -

Q. You've heard shots from a semiautomatic before?

A. Yes, sir.

Q. And is it your testimony that these shots were quick but not—not quick in the sense of fully automatic, one-trigger pulls? Right?

A. Yes, sir. Yes, sir.

Mr. Mortenson testified to the following: he had served in the military for nearly twenty-seven years; he was familiar with both automatic and semi-automatic rifle fire; he had heard both types of weapons being fired; he could differentiate between the two; he clearly heard the shots that were fired; and the shots he heard were not from an automatic weapon (or, by inference, not from a weapon that was set to fire in "automatic" bursts). We hold the State laid a sufficient foundation "that [Mr. Mortenson's testimony was] rationally based on [his] perception." *Mitchell*, __ N.C. App. at __, 840 S.E.2d at 283 (citation omitted); *see also Fisher*, 171 N.C. App. at 214, 614 S.E.2d at 437.

Mr. Mortenson's presence at the scene of the crime qualified him to present his personal perception of the event, including his perception of the gunfire. Mr. Mortenson's prior military experience simply provided contextual support for a finding that his opinion was rationally based. N.C.G.S. § 8C-1, Rule 701. Furthermore, Mr. Mortenson's testimony was necessary to the determination of a fact in issue: whether Defendant fired seven separate and distinct shots. *Id.* Mr.

Mortenson's testimony was based on facts and circumstances that allowed him "to do more than hazard a guess[,]" was "a question of credibility [for the jury to decide] rather than a question of admissibility[,]" and, therefore, "the testimony [wa]s admissible." *Green*, 77 N.C. App. at 431, 335 S.E.2d at 177 (citations omitted). Defendant has failed to show error, much less plain error.

## B. *Double Jeopardy*

Defendant argues that the trial court sentenced Defendant in violation of his Fifth Amendment right to be free from double jeopardy. However, because Defendant did not preserve this argument by objection at trial, we dismiss it.

The North Carolina Rules of Appellate Procedure require a party to preserve an issue for appeal by "present[ing] to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make[.]" N.C. R. App. P. 10. In this case Defendant did not raise any objection based on issues of double jeopardy. In failing to raise the issue of double jeopardy at trial, Defendant has not preserved the issue for appeal. *See State v. Kirkwood*, 229 N.C. App. 656, 664, 747 S.E.2d 730, 736 (2013) (citation omitted) ("Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal."). "The decision to review an unpreserved argument relating to double jeopardy is entirely discretionary[,]" *State v. Mulder*, 233 N.C. App. 82, 87, 755 S.E.2d 98, 101 (2014), but our Rules of Appellate Procedure counsel we exercise this

discretion sparingly. *See* N.C. R. App. P. 2 (2019); *State v. Gayton-Barbosa*, 197 N.C. App. 129, 134, 676 S.E.2d 586, 589 (2009) (citation omitted) ("the Supreme Court has stated that this residual power to vary the default provisions of the appellate procedure rules should only be invoked rarely and in 'exceptional circumstances.'"); *see also Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008). Defendant has not demonstrated the exceptional circumstances required to support a decision by this Court to exercise our discretion for the purpose of considering the merits of Defendant's unpreserved double jeopardy argument. This argument is dismissed.[3]

### C. *Defendant's Motion to Dismiss for Insufficiency of Evidence*

Defendant further argues: "The Trial Court Erred by Denying [Defendant's] Motion to Dismiss for Insufficiency of the Evidence as to Seven Charges of Discharging a Firearm into an Occupied Vehicle, Where the Evidence Supported Only a Single Charge." We disagree.

### 1. Standard of Review

Our standard of review on a defendant's motion to dismiss is well-settled:

> We review denial of a motion to dismiss criminal charges *de novo*, to determine "whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." Substantial evidence is relevant evidence that a reasonable

---

[3] We note that our analyses of Defendant's other arguments on appeal lead us to the conclusion that Defendant's double jeopardy argument was unlikely to succeed on the merits.

mind would find adequate to support a conclusion. We must consider evidence in a light most favorable to the State and give the State the benefit of every reasonable inference from the evidence.

*State v. Mobley*, 206 N.C. App. 285, 291, 696 S.E.2d 862, 866 (2010) (citations omitted). This Court has noted evidence that a reasonable mind might accept as adequate to support a conclusion:

> "'Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. If the evidence presented is circumstantial, the court must consider whether a reasonable inference of defendant's guilt may be drawn from the circumstances. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then it is for the jury to decide whether the facts, *taken singly or in combination*, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.'"

*Kirkwood*, 229 N.C. App. at 661–62, 747 S.E.2d at 734 (citations omitted). Further:

> "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied," however, if the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed[.]"

*State v. Nobles*, 350 N.C. 483, 504, 515 S.E.2d 885, 898 (1999) (citations omitted).

### 2. Discharging a Weapon into an Occupied Vehicle

In North Carolina, any person who "willfully or wantonly discharges a weapon . . . into any occupied vehicle . . . is guilty of a Class D felony." N.C. Gen. Stat. § 14-34.1(b) (2019). N.C.G.S. § 14-34.1(a) defines weapon as "any firearm or barreled weapon capable of discharging shot, bullets, pellets, or other missiles at a muzzle velocity of at least 600 feet per second[.]" Defendant only contests six of his seven convictions for DWOV. Therefore, for the purposes of N.C.G.S. § 14-34.1(b), Defendant does not contest that the rifle he fired constituted a "weapon" or that he "discharged" the "weapon" seven times into "an occupied vehicle," *i.e.*, the truck. N.C.G.S. § 14-34.1(b). Further, Defendant acknowledges that the *first* shot fired into the truck *was* committed "willfully or wantonly." *Id.* Defendant's argument on appeal is limited to the question of whether the State failed to prove Defendant's six *additional* shots into the truck were "discharged" "willfully or wantonly." *Id.*

a. Automatic Rifle

Defendant states: "The trial court denied his motion and specifically allowed the eight separate counts of DWOV to go to the jury 'based on the testimony of Mr. Mortenson.'" Defendant primarily relies on his contention that there was insufficient evidence to dismiss the possibility Defendant used an automatic weapon in the shooting. Defendant contends that, if he did use an automatic weapon, then all seven projectiles that hit the truck were likely the result of a single pull of the rifle's trigger, and therefore constituted a single act, not seven distinct acts. *See State v. Rambert*,

341 N.C. 173, 176, 459 S.E.2d 510, 513 (1995); *Nobles*, 350 N.C. at 505, 515 S.E.2d at 899; *Kirkwood*, 229 N.C. App. at 667, 747 S.E.2d at738.

However, Mr. Mortenson's testimony, which we have held was not improperly admitted, included testimony that he was familiar with both automatic and semi-automatic firearms from his nearly twenty-seven-year military career. Mr. Mortenson testified that he could tell the difference between the sound of automatic and semi-automatic gunfire, and the shots he heard as Defendant was firing a rifle into his fleeing, occupied truck were from a semi-automatic weapon, not from an automatic weapon. Because this testimony was properly in evidence, the weight and credibility determinations concerning this testimony were for the jury to decide. *Kirkwood*, 229 N.C. App. at 661–62, 747 S.E.2d at 734. The jury, through its verdicts, determined that Defendant's acts of firing a weapon seven times into the occupied truck did *not* constitute a single act of automatic fire, but seven distinct and separate acts.

### b. Semi-Automatic Rifle

Defendant further argues that even if he was firing a semi-automatic weapon into the occupied truck, the State still failed to prove more than one continuous act:

> Even if the weapon were a semi-automatic assault rifle, the lack of any clear separation among the rapid shots in direction or time indicates that the firing at [the] truck was a single act. In *Rambert*, *Nobles*, and *Kirkwood*, the character of the firearm – which was specifically identified in each case – was only one of several factors. Even on that

- 17 -

factor, the State failed to meet its burden here. The allegedly semi-automatic sound of the unidentified firearm in this case did not provide substantial evidence that the function of the weapon "required that defendant employ his thought processes each time he fired the weapon." *Rambert*, 341 N.C. at 176-77, 459 S.E.2d at 513.

Initially, through Mr. Mortenson's testimony, the State presented substantial evidence "identifying" the weapon Defendant used as a semi-automatic .22 caliber rifle. Though it is possible to purchase or modify certain firearms so they can be set to fire in either automatic or semi-automatic modes, it was unnecessary for the State to prove that the .22 caliber rifle *could not* be used as an automatic rifle, only that Defendant *was not* using it as such when he repeatedly fired into the truck occupied by Mr. Mortenson and the women. A semi-automatic rifle requires the person using it to pull the trigger each and every time that person wants to shoot the rifle at a target. Defendant asks this Court to conclude that the State presented insufficient evidence that Defendant had the requisite intent—willfully and wantonly—to discharge his weapon into the occupied truck for the six shots Defendant fired subsequent to the first shot fired into the truck. Defendant continues:

> The State also failed to provide evidence identifying the firearm used and the nature of its firing mechanism – evidence critical to the decisions in *Rambert*, *Nobles*, and *Kirkwood*. Each of those cases involved a "revolver," while the two witnesses who claimed to see the weapon in this case described it as an "assault rifle" and definitely not a "handgun."

Defendant's focus on whether the weapon was a rifle or a handgun is misplaced, and we held above that Mr. Mortenson's testimony was proper and sufficient for the jury to determine the rifle Defendant used was semi-automatic—therefore requiring Defendant to pull the trigger each time he chose to fire another shot into the fleeing truck. It was not necessary to identify the exact "nature of its firing mechanism," only that a single trigger pull of the rifle Defendant was using released only a single projectile—*i.e.*, that the rifle was not firing on automatic. In *Rambert*, our Supreme Court held:

> [The] defendant's actions were three distinct and, therefore, separate events. *Each shot,* fired from a pistol, as opposed to a machine gun *or other automatic weapon,* required that defendant *employ his thought processes each time he fired the weapon.* Each act was distinct in time, and each bullet hit the vehicle in a different place. This decision is consistent with prior case law.

*Rambert*, 341 N.C. at 176–77, 459 S.E.2d at 513 (citation omitted). In *Nobles,* the presence of seven bullet holes in the victim's vehicle was heavily relied on by our Supreme Court to justify seven distinct charges of DWOV, even though witnesses testified that they heard only four gunshots and only four shell casings were recovered at the scene of the crime. *Nobles*, 350 N.C. 483, 515 S.E.2d 885. In *State v. Hagans*, this Court went even further to find it "conceivable that defendant could have been indicted for six counts of attempted discharge of a firearm into occupied property[,]" where "the State's evidence tended to show that seven shots were fired

- 19 -

toward [the] car and that one bullet hole was found in [the] car." *State v. Hagans*, 188 N.C. App. 799, 805, 656 S.E.2d 704, 708 (2008). In *Kirkwood*, the evidence showed that "three gunshots were fired in quick succession. [Two witnesses] each heard three distinct although rapid gunshots." *Kirkwood*, 229 N.C. App. at 667–68, 747 S.E.2d at 738. Mr. Mortenson, a veteran, also heard "distinct although rapid gunshots[,]" *id.*, which prompted the women's quick entry into the truck, as well as his decision to press the accelerator of the truck and speed away as Defendant's bullets kept hitting the truck. Further, the evidence in *Kirkwood* did not establish the weapon used, or whether the defendant was the sole shooter:

> We note that, based on our review of the record, there are several scenarios of the shooting supported by the evidence. For example, it is possible that two gunmen in the SUV, each using a different gun, fired one or more shots into the house. It is further possible that one gunman used both guns while shooting. It is also possible, however, that a single gunman used only the revolver.
>
> However, despite this uncertainty as to the number of shooters and whether only the revolver rather than both guns was used in the shooting, the State's evidence nevertheless tended to show that each of the three shots for which [the] defendant [ ] was convicted was "distinct in time, and each bullet hit the [house] in a different place."

*Id.* at 668, 747 S.E.2d at 738 (citation omitted).

Applying the logic of *Rambert*, *Nobles*, and *Kirkwood*, because the weapon Defendant used was not "a machine gun or other automatic weapon," *Rambert*, 341 N.C. at 177, 459 S.E.2d at 513—it was a weapon that required Defendant to pull and

release the trigger each time he decided to shoot into the occupied truck—Defendant's use of the semi-automatic rifle "required that defendant employ his thought processes each time he fired the weapon." *Id.*

Defendant further argues:

> The State did not present evidence of shots separated in time and fired into a vehicle from different angles, as in *Rambert* and *Nobles*. To the contrary, the State's evidence was that [Defendant] drove around the truck but only fired at it from behind as it was driving away. Every bullet entered the back of the truck. This was a single episode of "rapid" gunfire.

(citations omitted). It is elementary that every "shot" from a single weapon is "separated in time." Further, the Court in *Rambert* did not presume to establish a threshold for sufficient relevant evidence applicable to all similar crimes. Each set of facts is different and must be considered in context. There is certainly no holding in *Rambert* or *Nobles* that prevents multiple convictions for DWOV simply because the vehicle is racing away from the gunfire on a relatively straight roadway. If Defendant had started firing while he was still in front of the truck, and Mr. Mortenson had fled by driving past Defendant, the pattern of bullet holes in the truck might have more closely resembled those in *Rambert*, but Defendant apparently did not decide to open fire on the truck until he was well positioned behind it. *Rambert*, 341 N.C. at 176–77, 459 S.E.2d at 513.

In addition, Mr. Mortenson testified that Defendant was firing at the truck before he "floored the truck to exit the situation," and that the shooting continued as he was trying to distance himself and the women from Defendant by speeding west down Highway 211. The reason Mr. Mortenson hit his accelerator is because Defendant had started shooting at them in the truck. Ms. Oldham's testimony corroborated Mr. Mortenson's, and she testified that Defendant started firing before she and Ms. Blue had entered the truck so she "just pushed her [Ms. Blue] in the truck," then Ms. Oldham "hop[ped] in as much as [she could,]" and told Mr. Mortenson "[g]o, go, go." Ms. Oldham continued: "And whenever we pulled off, you could just hear the bullets hitting the truck—the back of the truck." "[H]alf of my body was in the truck, and I was trying to get the door shut. But like I said, when we drove off, he just lit—I mean, [Defendant] shot up the back of the truck." Ms. Oldham stated that she was on the phone with her boyfriend during the incident, and further testified:

> [W]henever I had first got into [the] truck, I remember being on the phone with my boyfriend at the time and being like, "He's shooting at us." And he thought I was joking. Like, he thought that it was a joke. And I was like, "I'm serious." And then he heard gunshots, and he was like, "Oh, my God, babe. This is really happening." And I was like, "Yes."

Defendant argues that the State failed to present sufficient evidence pursuant to the requirements of *Rambert*, *Nobles*, and *Kirkwood* to prove seven separate acts of DWOV. Viewed in the light most favorable to the State and drawing all reasonable

inferences in favor of the State, there was substantial evidence from which reasonable jurors could have determined seven of the shots Defendant fired into the occupied truck were done "willfully or wantonly." N.C.G.S. § 14–34.1. The State presented substantial evidence that Defendant's actions did not constitute "a single episode of 'rapid' gunfire" but, rather, "separate and distinct acts" that occurred over a period of time within which Defendant started firing, the women jumped into the truck, Ms. Oldham told Mr. Mortenson to "[g]o, go, go," then had a short exchange with her boyfriend on the phone before more shots were fired at the truck as it sped away. The trial court did not err in denying Defendant's motion to dismiss, and correctly left it to the jury to determine whether the evidence proved beyond a reasonable doubt Defendant committed seven "separate acts" supporting seven convictions for DWOV.

## IV. <u>Conclusion</u>

For the reasons stated above, we dismiss Defendant's double jeopardy argument and hold the trial court did not err in permitting Mr. Mortenson to testify to his opinion of the type of gunfire he heard, and did not err in denying Defendant's motion to dismiss. We therefore find no error.

NO ERROR.

Judges DIETZ and COLLINS concur.